ORIGINAL

FILED
MAY - 8 2006
U.S. COURT OF FEDERAL CLAIMS

ECF

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**Bid Protest**

| | | |
|---|---|---|
| **210 EARLL, L.L.C.,** **Plaintiff** | ) | |
| **vs.** | ) | Case No. 06-360 C |
| **THE UNITED STATES OF AMERICA, GENERAL SERVICES ADMINISTRATION,** **Defendant.** | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, PERMANENT INJUNCTION AND DECLARATORY JUDGMENT**

Dated: May 8, 2006

Submitted by:

Edward V. Gregorowicz, Jr.
Law Offices of Edward V. Gregorowicz
10565 Lee Highway, Suite 102
Fairfax, Virginia 22030
(703) 934-6645 (telephone)
(703) 934-6649 (facsimile)

# TABLE OF CONTENTS


I. QUESTIONS PRESENTED .......... 1

II. STATEMENT OF THE CASE .......... 2

III. ARGUMENT .......... 7

A. Jurisdiction and Standing .......... 8

B. Standard of Review .......... 9

C. Plaintiff is Likely to Succeed on the Merits of its Complaint .......... 11

1. The Government Failed to Make Award in Accordance with the Solicitation .......... 11

a. Quality of Space .......... 13

b. Past Performance .......... 13

2. The Evaluation of 210 Earll's Price Proposal was Prejudicial and Improper .......... 15

3. 4041 Central Cannot Comply with the Minimum Requirements of the SFO, as amended, and therefore 4041 Central is a Non-conforming Bidder that is not Eligible for Award .......... 19

a. Contiguous Space .......... 20

b. Secure Parking .......... 23

c. Level IV Security Standards .......... 23

d. Seismic Standards .......... 24

e. Additional Non-conforming Items .......... 27

4. An Award Letter is Not a Valid, Enforceable Contract .......... 29

5. 210 Earll is Entitled to Receive Lease Award .......... 32

D. 210 Earll Will Suffer Irreparable Harm if the Lease is Signed and Partially Performed .......... 33

E. The Balance of the Hardships Tips is the Plaintiff's Favor .......... 34

F. A Preliminary Injunction and Temporary Restraining Order is in the Public Interest .................36

G. Plaintiff is also Entitled to Permanent Injunctive Relief and Declaratory Relief .........................37

H. Bond ........................................................................................................................ 38

IV. CONCLUSION ........................................................................................................38

V. Appendix ............................................................................................................attached

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Action Service Corp. v. Garrett,* 790 F.Supp. 1188 (D. Puerto Rico 1992) .......... 33

*Adelaide Bloomfield Management Company,* B-253128.2, September 27, 1993, 93-2 ¶ 197 .......... 33

*Advanced Sys. Tech. Inc. v. United States*, 69 Fed. Cl. 474 (2006) .......... 38

*Aeroplate Corp. v. United States,* 67 Fed. Cl. 1 (2005) .......... 38

*Allied Technology Group, Inc. v. United States,* 39 Fed. Cl. 125 (1997) .......... 22

*ALT Communications, Inc.*, B-246315, Mar. 2, 1992, 92-1 CPD ¶ 248 .......... 19

*Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345 (Fed. Cir. 2004) .......... 9

*Bachy/Bauer/Green Joint Venture*, B-235950, Sept. 18, 1989, 89-2 CPD ¶ 240 .......... 13

*Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303 (2000) .......... 37

*B.K. Instrument, Inc. v. U.S.*, 715 F.2d 713 (C.A. N.Y. 1983) .......... 34

*Buffalo Cent. Terminal v. U.S.*, 886 F.Supp. 1031 (W.D N.Y. 1995) .......... 32, 33, 34

*CESC Plaza Ltd. Partnership v. United States*, 52 Fed. Cl. 91 (2002) .......... 9

*Charles H. Tompkins Co. v. United States*, 43 Fed. Cl. 716, 719 (1999) .......... 10

*Chrysler Motors v. Auto Body Panels of Ohio,* 908 F.2d 951 (Fed. Cir. 1990) .......... 11

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402 (1971) .......... 10

*CSE Const. Co., Inc. v. United States*, 58 Fed. Cl. 230 (2003) .......... 10

*Day & Zimmerman Servs. v. United States*, 38 Fed. Cl. 591 (1997) .......... 36

*Delta Data Systems Corp. v. Webster,* 744 F.2d 197 (D.C. Cir. 1984) .......... 33

*Dubinsky v. United States,* 43 Fed. Cl. 243 (1999) .......... 16

*DTH Management Gr'p*, 844 F. Supp 251 (E.D. N.C. 1993) .......... 38

*Ellsworth Assocs., Inc. v. United States,* 45 Fed. Cl. 388 (1999) .......... 35

*ES-KO, Inc. v. United States*, 44 Fed. Cl. 429 (1999) .......... 11

*Essen Mall Properties v. United States*, 21 Ct. Cl. 430 (1990) .......... 31

*Gemmo Impianti SpA*, B-290427, August 9, 2002, 2002 CPD ¶ 146 .......... 18

*Hydro Eng'g, Inc. v. United States*, 37 Fed. Cl. 448 (1997). .......... 17

*ITT Federal Services Corp. v. U.S.*, 45 Fed. Cl. 174, 190 (1999) .......... 16

*Federal Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453 (1972) .......... 10

*Firth Const. Co., Inc. v. U.S.*, 36 Fed. Cl. 268 (1996) .......... 19, 20

*For Your Information, Inc.*, B-278352, December 15, 1997, 97-2 CPD ¶ 164 .......... 16

*Four Points By Sheraton v. United States.*, 66 Fed. Cl. 776 (2005) .......... 9

*Gentex Corp. v. United States*, 58 Fed. Cl. 634 (2003) .......... 10

*Hawpe Constr., Inc. v. United States*, 46 Fed. Cl. 571 (2000) .......... 37

*Hospital Klean of Texas, Inc.*, 65 Fed. Cl. 618 (Fed. Cir. 2005) .......... 36, 38

*Info., Tech. and Applications Corp. v. United States*, 51 Fed. Cl. 340 (2001) .......... 10

*International Business Machines, Inc.*, B-275554, March 3, 1997, 97-1 CPD ¶ 114 .......... 15

*Isratex, Inc. v. United States*, 25 Cl. Ct. 223 (1992) .......... 13

*Joanell Laboratories et al.*, B-242415.3, May 1, 1991, 91-1 CPD ¶ 424 .......... 19

*Keco Industries, Inc. v. Laird*, 318 F.Supp. 1361 (D.D.C.1970) .......... 34

*Lithos Restoration, Ltd.*, B-247003.2, Apr. 22, 1992, 92-1 CPD ¶ 379 .......... 22

*Mainmark Associates, Ltd.*, B-222454, July 3, 1986, 86-2 CPD ¶ 31 .......... 20, 22

*ManTech Advanced Sys. International, Inc.*, B-240136, October 26, 1990, 90-2 CPD ¶ 336 .......... 20

*Marshall-Putnam Soil.*, B-289949, B-289949.2, May 29, 2002, 2002 CPD ¶ 90 .......... 19

*McHugh/Calumet*, B-276472, June 23, 1997, 97-1 CPD ¶ 226 .......... 14

*Nevada Automotive Test Center*, B-251137, Mar. 9, 1993, 93-1 CPD ¶ 216 .......... 20

*Northrup Grumman et. al.*, B-2955526 et. al., March 16, 2005, 2005 CPD ¶ 45 .......... 18

*OAO Corp. v. United States,* 49 Fed. Cl. 478 (2001) .......... 11

*Opti-Lite Optical,* B-281693, March 22, 1999, 99-1 CPD ¶ 61 .......... 13

*Overstreet Elec. Co. v. United States,* 47 Fed. Cl. 728 (2000) .......... 35

*Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147 (Fed. Cir. 1994) .......... 36

*PGBA, LLC v. United States,* 57 Fed. Cl. 655 (2004) .......... 35

*Preferred Sys. Solutions, Inc.,* B-292322, August 25, 2003, 2003 CPD ¶ 166 .......... 18

*Pro Constr., Inc.*, B-272458, Oct. 10, 1996, 96-2 CPD ¶ 141 .......... 22

*Seaborn Health Care, Inc. v. United States,* 55 Fed. Cl. 520 (2003) .......... 11

*Seattle Sec. Services, Inc. v. United States*, 45 Fed. Cl. 560 (2000) .......... 34, 36

*Shirley Const. Corp.*, B-240357, Nov. 8, 1990, 90-2 CPD ¶ 380 .......... 13

*Shoals Am. Indus., Inc. v. United States,* 877 F.2d 883, 888 (11th Cir. 1989) .......... 13

*Sterling-Kates v. United States*, 12 Cl. Ct. 290, 34 Cont. Cas. Fed. (CCH) ¶ 75,286 (1987) .......... 30, 32

*Ulstein Maritime, Ltd. v. United States,* 833 F.2d 1052 (1st Cir.1987) .......... 33

*University Research Co., LLC v. U.S.*, 65 Fed. Cl. 500 (2005) .......... 35

*United Power Corp. v. United States*, 736 F. Supp. 354 (D.D.C. 1990) .......... 36

**FEDERAL STATUTES**

5 U.S.C. § 706 (2005) .......... 10, 37

28 U.S.C. § 1491 (2005) .......... 7, 8, 9, 37

31 U.S.C. § 3551 (2005) .......... 9

31 U.S.C. § 3553 (2005) .......... 8

41 U.S.C. § 253 (2005) .......... 10, 16, 19

**MISCELLANEOUS**

R.C.F.C. 65 .......... 1, 7, 38

48 C.F.R. § 15.305(a) .......... 16

Blacks Law Dictionary 290 (5th ed. 1979) .......... 20

In accordance with Rule 65 of the Rules of the United States Court of Federal Claims, hereinafter "RCFC," PLAINTIFF 210 EARLL, LLC ("Plaintiff" or "210 Earll"), through undersigned counsel, hereby submits this memorandum of points and authorities in support of its accompanying Motion for Preliminary Injunction, Permanent Injunction, Temporary Restraining Order and Declaratory Relief . In the accompanying Motion, Plaintiff seeks an immediate injunction ordering Defendant United States, acting through the General Services Administration ("GSA" or "the Agency"): (a) not to sign any lease agreement with 4041 Central under the SFO; and (b) directing GSA not to proceed otherwise with award of the lease under the SFO to 4041 Central.

Plaintiff further respectfully asks the Court to declare the rights and obligations of the parties, and to enter an Order finding that: (a) 4041 Central submitted a non-conforming bid in response to the Solicitation for Offers No. 3AZ0031 ("SFO" or "solicitation"); (b) 4041 Central is accordingly ineligible to be awarded the subject lease; (c) 210 Earll, as second-in-line to be awarded the subject lease is entitled to receive the lease award; and (d) GSA must award the subject lease to 210 Earll.

Plaintiff also hereby moves this Court to issue a Permanent Injunction: (a) prohibiting GSA from signing a lease agreement under the SFO with 4041 Central; (b) prohibiting GSA from proceeding otherwise to enter into a lease agreement under the SFO with 4041 Central; (c) canceling or abrogating any lease obligation(s) which might already exist between GSA and 4041 Central (or which might arise after the date of this Complaint) in relation to the SFO, as void *ab initio;* and (d) directing GSA to award the subject lease to 210 Earll.

## I. QUESTIONS PRESENTED

A. Whether the Court should temporarily restrain and preliminarily restrain

GSA from executing the subject lease under the SFO.

B. Whether the Court should declare that the apparently successful offeror, 4041 Central, submitted a non-conforming bid in response to the SFO and is the therefore ineligible to be awarded the subject lease.

C. Whether the Court should permanently terminate and/or rescind GSA's award to 4041 Central and award the lease to the second-in-line, acceptable offeror, 210 Earll, whose offer fully complies with the SFO without deviation.

## II. STATEMENT OF THE CASE

### A. Parties and the Contract Awardees

1. Plaintiff 210 Earll is a limited liability company, duly organized and existing under the laws of the State of Arizona. 210 Earll owns and operates a commercial real property, located at 210 East Earll Drive, Phoenix, Arizona, where it currently is the incumbent lessor of office and related rental space to the United States Internal Revenue Service (the "IRS").

2. Defendant is the United States of America, acting by and through the GSA.

3. Non-party 4041 Central is or was the successful bidder under GSA SFO Number 3AZ0031.

### B. The Solicitation, Lease Award and Protest

4. On or about October 2, 2005, the GSA issued Solicitation for Offers No. 3AZ0031, dated September 27, 2005 (hereinafter, the "SFO"), seeking bids from commercial landlords for approximately 108,641 rentable square feet of office and related space, in the Central Business District of Phoenix, Arizona, for the IRS [App. 008-050]. 210 Earll is the incumbent lessor for the IRS' office space requirement which is the subject of the SFO.

5. GSA conducted a fatally flawed evaluation of the bids that it received in response to the SFO. This evaluation prejudiced 210 Earll.

6. The bid submitted by 4041 Central did not conform to, and did not meet, the minimum requirements of GSA's SFO. Nevertheless, on or about January 30, 2006, GSA issued a notice of award of the subject lease to 4041 Central. The notice was in the form of a letter, and requested that 4041 central sign a lease in accordance with its offer and the SFO, as amended [App. 271].

7. Contrary to the requirements of the SFO, GSA based its award decision exclusively on price [App. 188].

8. GSA did not perform any technical evaluation or ranking of the bids submitted by any of the offerors, and GSA did not perform any cost reasonableness or cost realism analysis of 4041 Central's bid [App. 188].

9. GSA did not do any technical/cost trade-off of the offers, and made no attempt to compare the offerors on the basis of the award factors set forth in the SFO [App. 155-162].

10. GSA advised 210 Earll at the statutory debriefing on February 1, 2006, that 210 Earll had submitted the second-lowest priced offer of three offerors that submitted bids under the SFO, and that there were no deficiencies in 210 Earll's offer [App. 125].

11. GSA violated the requirements of the SFO by failing to conduct any analysis of the cost of relocation of furniture and/or telecommunications equipment.

12. The security requirements under SFO include Level IV Security [App. 054].

13. Many of the required security items, including lobby security, security cameras and alarms, already exist in the premises leased by GSA for the IRS at 210 Earll, but do not currently exist at 4041 Central [App. 232].

14. GSA's price evaluation of the competing bids did not properly take into consideration the additional costs that would have to be borne by GSA as a lump sum payment as part of moving the IRS offices from 210 Earll to 4041 Central [App. 132].

15. Because of the defects in GSA's cost analysis, including, but not limited to the items enumerated above, GSA's price evaluation of the competing bids did not fairly or accurately compare the offers submitted by 210 Earll and 4041 Central.

16. 210 Earll was prejudiced by the defects in GSA's flawed technical evaluation and cost analysis of the competing bids received in response to the SFO. Under a proper technical evaluation and cost analysis of the bids received in response to the SFO, 4041 Central's bid is not the most advantageous offer received by the Government, and the subject lease must be awarded to 210 Earll.

17. In addition, 4041 Central was an unacceptable offeror because its bid does not comply with the minimum requirements of the SFO.

18. The SFO requires that all of the rental space must be "contiguous." [See SFO at § 1.1A.1, App. 012]. 4041 Central offered non-contiguous blocks of space in a twenty (20) story building, plus an adjacent building, that would require the Government to move all of its furnishings and equipment and reconstruct the improvements already in place at 210 Earll at the Government's expense.

19. In contrast, 210 Earll offered the Government all contiguous space on five (5) of the six (6) floors in its building, and agreed to provide the Government with swing space in the building as needed and agreed to move the Government's furnishings and equipment within the building as needed without any cost or expense to the Government.

20. The SFO requires that the building provide secure parking. [See SFO, Attachment 1 at § 10.1B, App. 052]. 4041 Central has a large, multi-level parking garage open to the public which cannot be secured for a feasible cost.

21. 210 Earll's bid includes parking space which is already secure.

22. The SFO requires the building to meet Level IV security standards. [See SFO, Attachment 1, at § 10.2.3, App. 054]. As a twenty-story, multi-tenanted facility with no fencing, no set-backs, eight points of ingress/egress (which also houses a school with approximately 500 students occupying 54,800 square feet), 4041 Central cannot meet Level IV security standards for an economically feasible price.

23. 210 Earll already has in place most of the features required to meet Level IV security standards. In addition, 210 Earll has offered to give the Government access control of the building through the main lobby, with a secure loading dock and secure courtyard between the building and the parking garage.

24. Upon information and belief, 4041 Central also fails to meet the following minimum requirements of the SFO: (a) seismic standards [See SFO § 2.2, App. 021]; (b) ceiling heights [See SFO § 5.7, App. 031]; and (c) elevator speed requirements [See SFO § 6.17, App. 042].

25. Because of 4041 Central's failure to comply with the SFO's minimum requirements, including, but not limited to the items enumerated above, GSA is required to find that 4041 Central has submitted a non-conforming bid and is ineligible to be awarded the subject lease.

26. 210 Earll has been prejudiced by GSA's failure to properly evaluate 4041 Central's offer.

27. After the receipt of 4041 Centrals' best and final offer, GSA improperly engaged in discussions with 4041 Central for the purpose of assisting 4041 Central in obtaining an exemption from the seismic standards requirements set forth in the SFO [App. 135].

28. 210 Earll has been prejudiced by GSA's post-award discussions with 4041 Central concerning the seismic standards.

29. On February 6, 2006, 210 Earll timely filed a bid protest with the United States General Accountability Office (the "GAO"), pursuant to 4 C.F.R. Part 21, GAO Protest No. B-297953 [App. 001-007], contesting GSA's decision to award the lease under the SFO to 4041 Central. 4041 Central intervened in 210 Earll's protest, in defense of its receipt of the lease award.

30. In a conference call held on April 24, 2006, counsel for the GAO informed counsel for the parties and counsel for 4041 as intervenor of its intention to sustain the protest. GAO advised that 210 Earll was an interested party, and that GSA's flawed evaluation had prejudiced 210 Earll.

31. Despite intimating that GSA's award of the subject lease to 4041 Central was flawed, GAO indicated that 210 Earll's remedy was limited to bid preparation costs and attorney's fees.

32. The GSA has never executed a lease with 4041 Central.

33. GSA's award of a lease to 4041 Central is conditioned upon the parties entering into a fully executed lease. To date, it is 210 Earll's understanding that neither GSA nor any other agency of the United States Government has signed the subject lease agreement with 4041 Central.

34. On May 5, 2006, GAO issued a Decision on 210 Earll's protest of the lease award to 4041 Central [App. 273-275]. In its Decision, GAO determined that the protest was "academic" because GSA had agreed to pay 210 Earll its bid preparation cots and the costs of filing its protest, including reasonable attorneys' fees. GAO refused to recommend that the lease award to 4041 Central be terminated. GAO indicated that award of bid preparation costs and attorneys fees was the maximum remedy it could provide.

35. The awarded lease is not expected to commence until July 2007 at the earliest, and the IRS tenant that will occupy the space under the awarded lease currently occupies the premises at 210 Earll under a lease that will not expire by its terms until September 2007.

## III. ARGUMENT

The Court may issue a preliminary injunction, permanent injunction, temporary restraining order and declaratory relief pursuant to Rule 65(a) and 65(b) of the RCFC and 28 U.S.C. § 1491(b)(2). The Court should grant 210 Earll's request for injunctive and declaratory relief enjoining GSA from executing the subject lease, rescinding the illegal award to 4041 Central and awarding the lease to the second-in-line, acceptable offeror, Plaintiff 210 Earll, because, as shown below: (1) GSA failed to make the award in accordance with the solicitation; (2) GSA's evaluation of the bids was improper and prejudicial to 210 Earll; and (3) the apparently successful bidder, 4041 Central, did not comply with the minimum requirements of the SFO, and, therefore, 4041 Central is a non-conforming bidder that is not eligible for award. GSA's decision to award the lease to 4041 Central was therefore irrational, and agency's conduct was arbitrary, capricious and contrary to law. Moreover, based on the precedents of this Court, the award letter issued to 4041 is not an enforceable contract and 210 Earll is entitled to receive the award.

Additionally, no lease has been executed by the Government under the SFO. Rather, an award letter was issued on January 30, 2006, and a lease was sent to 4041 Central to be executed by the parties. Purportedly, 4041 Central has executed the proposed lease, but GSA has not. Until a decision was issued by GAO on May 5, 2006, there was a stay pursuant to the Competition in Contracting Act of 1984 ("CICA") preventing GSA from executing the lease until resolution of Plaintiff's currently pending GAO protest.1 *See* 31 U.S.C. § 3553(d)(3)(c)(i). Now that the GAO has issued a decision, however, the CICA stay is lifted and GSA will have the opportunity to execute the lease. Absent a termination for convenience clause, this will require the Government to incur breach of contract damages under that lease to make award to 210 Earll. *See Adelaide Bloomfield Management Company,* B-253128.2, September 27, 1993, 93-2 ¶ 197. As demonstrated in the analysis below, Plaintiff has established that it is entitled to the temporary restraining order and preliminary injunction preventing the GSA from executing the lease.

Therefore, 210 Earll can demonstrate a likelihood of success on the merits, and thereby satisfies the first factor this Court considers when evaluating temporary restraining orders and preliminary injunctions. As for the second factor, 210 Earll will suffer irreparable harm if the lease is executed and partially performed. The balance of hardships, the third factor, also tips heavily in the 210 Earll's favor. Finally, with respect to the fourth factor, the granting of the temporary restraining order and preliminary injunction serves the public interest.

**A. Jurisdiction and Standing**

This Court has jurisdiction over this bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1), amended by the Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104-320, § 12(a), 110 Stat. 3870, 3874-75 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491(b).

1 Plaintiff's filed its Protest with the GAO on February 6, 2006. The GAO protest file number is B-297953..

*Argencord Mach. & Equip., Inc. v. U.S.* 68 Fed. Cl. 167, 172 (2005). The Tucker Act grants the Court jurisdiction over "an action by an interested party objecting to…any alleged violation of statute or regulation in connection with a procurement." 28 U.S.C. § 1491(b)(1).

The Federal Circuit has construed "interested party" under ADRA to comport with "interested party" as defined in CICA, 31 U.S.C. § 3551. *Four Points By Sheraton v. U.S.*, 66 Fed.Cl. 776, 783 (2005) (citing *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1352 (Fed. Cir. 2004)). CICA defines an "interested party" as an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or failure to award the contract." 31 U.S.C. § 3551(2) (2000). To establish the requisite standing necessary to challenge a contract award, a disappointed bidder must show that there was a "substantial chance" that it would have received the award but for the alleged error in the procurement process. *Four Points Sheraton v. United States,* 66 Fed. Cl. 776, 783 (2005).

Based on the information provided at the debriefing by the contracting officer, 210 Earll was the offeror second line for award (out of 3), and had the agency properly evaluated the offers submitted, 210 Earll would have been selected for award. Accordingly, there was a substantial chance that 210 Earll would have received the award but for GSA's error in declaring that 4041 Central was the successful bidder. Therefore, 210 Earll is an interested party and has standing to bring this bid protest. *See, e.g., CESC Plaza Ltd. Partnership v. U.S.*, 52 Fed. Cl. 91, 93 (2002) (Plaintiffs were finalists in the competition for the lease under the original SFO and therefore had standing). Further, the GAO determined that 210 Earll was an interested party after hearing argument on the GSA's motion to dismiss the protest [App. 123].

**B. Standard of Review**

In a bid protest, the court reviews the defendant's decision under the standards in the Administrative Procedure Act (APA), 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4). The APA directs a reviewing court to overturn an agency action that is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). In order to meet this standard, "the protestor must show by a preponderance of the evidence that the agency's actions were either without a reasonable basis or in violation of applicable procurement law." *Gentex Corp. v. United States,* 58 Fed. Cl. 634, 648 (2003) (quoting *Info., Tech. and Applications Corp. v. United States,* 51 Fed. Cl. 340 (2001) (ITAC), *aff'd,*316 F.3d 1312 (Fed. Cir. 2003) (internal citation omitted)).

While the agency's decision is entitled to a "presumption of regularity," *Charles H. Tompkins Co. v. U.S.*, 43 Fed.Cl. 716, 719 (1999) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)), that presumption does not shield the agency's decision from a "thorough, probing, in-depth review." *Id.* Although the court "recognize[s] the relevant agency's technical expertise and experience, and defer[s] to its analysis unless it is without substantial basis in fact," *Charles H. Tompkins Co.*, 43 Fed. Cl. at 719 (quoting *Federal Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972), the court must also perform an informed review of even technical decisions in order to meaningfully exercise its jurisdiction. *Id.* Pursuant to the CICA, the Government is required to specify its needs and solicit proposals "in a manner designed to achieve full and open competition for the procurement." 41 U.S.C. § 253(a)(1)(A) (1994).

On a request for a temporary restraining order and/or preliminary injunction, the Court must weigh the following factors: (1) the likelihood of plaintiff's success on the merits of its complaint; (2) whether plaintiff will suffer irreparable harm if the procurement is not enjoined;

(3) whether the balance of hardships tips in the plaintiff's favor, and (4) whether a preliminary injunction will be contrary to the public interest. *CSE Const. Co., Inc. v. U.S.*, 58 Fed. Cl. 230, 261 (2003) (citing *ES-KO, Inc. v. United States,* 44 Fed. Cl. 429, 432 (1999)); *see also Seaborn Health Care, Inc. v. United States,* 55 Fed.Cl. 520, 523-24 (2003); *OAO Corp. v. United States,* 49 Fed.Cl. 478, 480 (2001) ("When deciding if a TRO is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction"). None of the four factors, standing alone, is dispositive; thus, "the weakness of the showing regarding one factor may be overborne by the strength of the others." *Chrysler Motors v. Auto Body Panels of Ohio,* 908 F.2d 951, 953 (Fed. Cir. 1990).

**C. Plaintiff is Likely to Succeed on the Merits of its Complaint.**

After all filings in the GAO Protest and a conference call with the GAO and counsel, the GSA agreed to pay 210 Earll its bid preparation costs and attorneys fees {App. 272]. This concession was made in recognition of the fact that the GAO would have sustained the protest. In subsections (1) through (3) below, Plaintiff 210 Earll demonstrates in the same manner as determined by the GAO that it is likely to succeed in showing that GSA's award to 4041 Central was arbitrary, capricious and contrary to procurement law, specifically the CICA and precedent from this Court and the GAO Comptroller General. In subsections (4) and (5) below, Plaintiff 210 Earll demonstrates that 210 Earll is entitled to the injunctive and declaratory relief which it requests in its Motion.

**1. The Government failed to make award in accordance with the solicitation.**

The solicitation specified in Section 2.3 [See page 14 of Protest Exhibit 1, App. 021] that:

> The lease will be awarded to the Offeror whose offer will be most advantageous to the Government, price and other award factors which follow considered. The other factors are as follows:

1. Quality of Space
2. Past Performance of Offeror and other Key Personnel (i.e. architect, engineer, lead designer etc.) on Comparable Projects
3. Past Performance of Offeror in Managing and Operating Comparable Facilities

The "Other Factors" indicated in Section 2.3 were in addition to the Award Factors set forth in Section 2.1 "Accessibility" and Section 2.2 "Seismic Safety for Existing Construction." During the pre-proposal conference and discussions with the Government, 210 Earll was advised by GSA that the award decision was not going to be on the basis of price alone, and that 210 Earll was required to address each of these award factors in the offers submitted under the SFO. Contrary to the assertions by GSA in the GAO protest proceeding, the final award decision, as disclosed by the contracting officer at the February 1, 2006 debriefing, was not based on any evaluation of the technical award factors. In fact, it was discovered during the GAO proceeding that there was a lack of contemporaneous evaluation documentation, and that the GSA could not justify that a fair and reasonable evaluation in accordance with the SFO ever took place.

The contracting officer had specifically advised 210 Earll at the debriefing that there were no deficiencies in either 210 Earll's or 4041 Central's offers as to the award factors, and explained that no technical ranking of the offerors was ever performed by GSA. According to the contracting officer, the award decision was based entirely on the difference in price, and the other factors were only "additional information." There is an express and meaningful difference between a determination of "no deficiencies," and a reasoned source selection evaluation based upon the weighing of factors disclosed in a solicitation. The GSA defense stated in the protest proceeding, that the "other factors" set forth in SFO Section 2.3 were evaluated and that both 210 Earll and 4041 Central were at least "equal," was clearly a post-facto attempt to justify an award that was based entirely on price. Without an attempt to rank the three (3) offerors, GSA implied

that "no deficiencies" meant "equal." Yet, the offers were not equal as set forth on the record. Since 210 Earll had a higher quality (Class "A") building with a more experienced team, the failure to provide a technical evaluation directly prejudiced 210 Earll.

In a negotiated procurement, the Government is not required to make award to the bidder offering the lowest price unless the solicitation specified that price will be the determinative factor.2 *Opti-Lite Optical*, B-281693, March 22, 1999, 99-1 CPD ¶ 61 (sustaining protest where source selection decision was based on a purely mechanical application of the numerical scores for the technical factors and price) (citing *Shirley Const. Corp.*, B-240357, Nov. 8, 1990, 90-2 CPD ¶ 380 at 6). Where, as here, a solicitation indicates that price will be considered but does not indicate the relative importance of price and technical factors, they are considered approximately equal in weight. *Isratex, Inc. v. United States,* 25 Cl. Ct. 223, 229 (1992) (citations omitted); *Bachy/Bauer/Green Joint Venture*, B-235950, Sept. 18, 1989, 89-2 CPD ¶ 240.

**a. Quality of Space.**

The record in the protest proceeding evidences that the space offered by 210 Earll was of superior quality compared to 4041 Central. It is neither supported on the record, nor is it reasonable for GSA to argue that both 210 Earll and 4041 Central were of equal quality. In the agency's protest filings, the contracting officer cited to CoStar as the local real estate source familiar with the definition of a Class "A" Building [App. 136]. As noted in the protest record, it was CoStar, an independent agency, that had rated 210 Earll as a Class "A" building while rating 4041 Central as a Class "B" building [App. 177-178]. GSA's flawed attempt to rationalize after the fact that 210 Earll and 4041 Central are equal was furthers refuted by the architect of both

2 The United States Court of Federal Claims affords GAO's interpretation of procurement regulations deference. *Firth Const. Co., Inc. v. U.S.*, 36 Fed. Cl. 268, 272 (1996)(citing *Shoals Am. Indus., Inc. v. United States,* 877 F.2d 883, 888 (11th Cir.1989)).

buildings, Mr. Peter Lendrum, who provided his analysis of the buildings in writing [See Exhibit 1 of the March 27, 2006 protest submission by 210 Earll, App. 174-176].

**b. Past Performance.**

As with the quality of space factor, GSA offered a post-facto analysis to argue that past performance would not have affected the outcome of the award decision because 210 Earll was no better than equal to 4041 Central. In assessing the importance of the evaluation of past performance on comparable projects, the agency argued that the contracting officer was reasonable in concluding that both awardee and the protester provided excellent teams that are highly likely to be successful in this project. With regard to past performance in managing and operating comparable facilities, the agency argued that the contracting officer reasonably concluded that the past performance of awardee was excellent and that a thorough investigation of protester's past performance could not affect the award decision. In both cases, the agency relied on the contracting officer's assessment of the "experience" of the offerors. Specifically, the contracting officer determined that the past performance of both 210 Earll and 4041 Central as to key personnel on similar projects was "equal" "based on the experience in performing similar projects. But admittedly, the contracting officer did not check 210 Earl's references [App. 139]. Thus, GSA did not actually perform a past performance evaluation as part of the award decision.

The agency, by its own admission, never actually evaluated 210 Earll's "past performance." Specifically, the contracting officer checked references for 4041 Central, but had no basis to compare such references to 210 Earll, because none of 210 Earll's references was contacted. Accordingly, the agency regarded 4041 Central's past performance as good and 210 Earll's either as equal or neutral. In making this post-facto analysis, GSA ignores the

requirements of FAR § 15.610(c)(6) to provide 210 Earll with an opportunity to discuss past performance information obtained from references. *See McHugh/Calumet*, B-276472, June 23, 1997, 97-1 CPD ¶ 226. GSA also failed to consider information available to it that was close at hand resulting in 210 Earll having to shoulder the inequity of GSA's failure to obtain and consider relevant information on 210 Earll's past performance under similar Government leases. *See International Business Machines, Inc.*, B-275554, March 3, 1997, 97-1 CPD ¶ 114. Accordingly, GSA's failure to adequately consider past performance as part of the award decision was improper and unfairly prejudiced 210 Earll.

**2. The evaluation of 210 Earll's Price Proposal was prejudiced and improper.**

The GSA in its agency report to the GAO confirmed that in making the award decision the contracting officer did not factor the costs of moving or relocation from 210 Earll in 4041 Central's net present value price evaluation [App. 139]. In the Statement of Relevant Facts provided to the GAO, the contracting officer concedes this point as an "oversight," and provided a re-computed net present value computation. As argued by 210 Earll, however, the re-computed price analysis was based on certain unfounded "assumptions" that were neither explained nor linked to the actual costs of relocating the IRS from 210 Earll [App. 158-162]. As explained to the GAO, 210 Earll demonstrated that actual relocation costs would be far greater than GSA has proffered to the GAO had the agency conducted a fair and reasonable evaluation of the factors in this case [App. 162].

Further, the GSA's price evaluation was flawed because it did not take into consideration the difference in costs that would be incurred as the result of a move to 4041 Central. In the agency report to the GAO, the GSA contracting officer advised that no lump sum costs have been included in the net present value computations, because GSA does not have a basis for

assuming that tenant improvements will cost more at one building than the other [App. 139]. As demonstrated by 210 Earll, however, there are significant differences in the lump sum costs that will be incurred by the Government in a move to 4041 Central [App. 260-261]. GSA's failure to follow the price evaluation factors in the SFO, including the impact of relocation costs and lump sum costs, did prejudice 210 Earll. Had GSA done a proper price evaluation, 210 Earll would have been deemed the "most advantageous offer," price and other factors considered.

Section 1.15.D.4.c of the SFO [App. 018] requires that the cost of relocation of furniture and telecommunications be factored into the Government's net present value analysis. Further, Section 1.15D.4.b [App. 018] of the SFO indicates that items that will need to be reimbursed in a lump sum payment must also be added to the analysis. 210 Earll has alleged that the price evaluation conducted by GSA to compare the rents offered by 210 Earll and 4041 Central did not follow these sections of the SFO, and that GSA's failure to follow the SFO evaluation factors unfairly prejudiced 210 Earll. In fact, neither the initial price evaluation nor GSA's re-computed evaluation, as explained in the agency report to the GAO provides the basis for a proper evaluation of the difference in costs to be incurred by the Government under 210 Earll and 4041 Central's offers.

"It is a fundamental principle of federal procurement that offerors be treated equally; that is, offerors must be provided with a common basis for preparation of proposals, and award based upon the requirements stated in the solicitation, unless the offerors are notified of changes (or relaxation of) the agency's stated requirements." *ITT Federal Services Corp. v. U.S.*, 45 Fed. Cl. 174, 190 (1999) (citing *For Your Information, Inc.*, B-278352, December 15, 1997, 97-2 CPD ¶ 164. Both the CICA and the FAR require the agency to evaluate competitive proposals solely on the basis of the factors specified in the solicitation. *See* 41 U.S.C. § 253b (1994); 48 C.F.R. §

15.305(a). These requirements echo the "fundamental principle that the Government 'may not solicit proposals on one basis and make award on another basis.' " *Dubinsky v. United States*, 43 Fed. Cl. 243, 266 (1999). Consequently, this Court may grant an offeror relief if the offeror establishes that the agency evaluated the proposal on a basis different than that announced in the solicitation and that the offeror was prejudiced as a result. *Hydro Eng'g, Inc. v. United States*, 37 Fed. Cl. 448, 471 (1997).

In this case, where 210 Earll is the incumbent lessor, the price evaluation factors in the SFO must be applied fairly to result in a true price comparison to be considered with the "other factors" identified in the SFO for making the determination of the offer that is most advantageous to the Government. A fair evaluation would reasonably take into consideration the costs to be incurred under the competing proposals as set forth above. However, neither GSA's initial evaluation, nor the subsequent re-evaluation described by the contracting officer accomplishes this. GSA argued to the GAO that any argument that the protester or the awardee has a tenant improvement cost advantage over the other is, at best, pure speculation. However, there are facts on the record that demonstrate there is a difference in the costs to be incurred between the two buildings [App. 230-232], and GSA's arguments only showcase once again the fatal flaw in the way they evaluated the offers under this procurement – that there was no attempt to award a lease to the most advantageous offer, price and other factors considered. They simply decided to award the lease to the low bid, ignoring the other factors as argued above, and turning a blind eye to actual increased costs that would be borne by the Government as a result of the move out of 210 Earll.

Further, as set forth in the October 2, 2005 invitation to bid sent only to 210 Earll, GSA requested that 210 Earll provide 6 additional items beyond the SFO requirements at its own

expense [App. 191]. These additional items included new paint and carpet and relocation of all fixtures and furniture after hours in the Government's space, as well as swing space in the building. This is significant, because GSA's request that 210 Earll provide these items as a base expense created an advantage for 4041 Central, because these same costs would be paid by the Government out of the tenant improvement allowance under 4041 Central's offer. By adding these costs to 210 Earll's rent offer, GSA in effect raised the cost that 210 Earll was required to provide, such that 210 Earll was required to give GSA the same $36.00 tenant improvement allowance as 4041 Central, plus pay for these costs. These additional costs were not "pure speculation," as alleged, but were actually mandated by GSA.

Because GSA required that 210 Earll alone include in its bid items and costs that exceed the SFO requirements, GSA had an obligation to factor these costs into its price evaluation in order to fairly determine the difference in cost to the Government under the competing proposals. GSA failed to take any of these additional costs into consideration, which clearly prejudiced the evaluation of 210 Earll's rent. GSA's contemporaneous and recomputed evaluations did not satisfy the standard here. There are distinct categories of costs that must be considered for a fair apple-to-apples evaluation, and GSA's evaluation did not come close. The costs of relocation of furniture and telecommunications are one cost that must be considered without discount. Lump sum costs like the cost of painting, carpeting and relocation of furniture are another cost that must be considered. The latter were requested only from 210 Earll, such that they increased only 210 Earll's bid. Therefore, GSA's decision to ignore the impact of these items in its price evaluation unfairly prejudiced 210 Earll, and failed to comply with the requirement that the price evaluation reasonably represents the difference in costs to be incurred under competing proposals. *Northrup Grumman et. al.*, B-2955526 et. al., March 16, 2005, 2005

CPD ¶ 45 (unpublished) (citing *Preferred Sys. Solutions, Inc.*, B-292322, 2003 CPD ¶ 166 at 9 (August 25, 2003); *Gemmo Impianti SpA*, B-290427, 2002 CPD ¶ 146 at 5-6 (August 9, 2002)).

**3. 4041 Central Cannot Comply with the Minimum Requirements of the SFO, as Amended, and, therefore 4041 Central is a Non-conforming Bidder that is not Eligible for Award.**

Finally, the greatest failing by the GSA in this procurement lies in their relaxation of the SFO standards for 4041 Central, resulting in the acceptance of a non-conforming building that fails to meet the minimum requirements of the SFO, as amended. Notwithstanding the errors in evaluation and resulting prejudice to 210 Earll from the GSA's failure to conduct a fair and reasonable evaluation as explained above, the decision to award a lease to 4041 Central was fatally flawed because 4041 Central offered a non-conforming building that fails to meet the minimum standards of the solicitation, as amended. GSA's defense of 4041 Central as an acceptable offeror during the GAO protest proceeding was not supportable on the record. As explained by 210 Earll in the GAO proceeding, 4041 Central is not an acceptable offeror, and 210 Earll should have been selected for award as the most advantageous acceptable offer submitted to the Government.

In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award.3 *See* 41 U.S.C. § 253b(a) (1994); *see also Joanell Laboratories et al.*, B-242415.3, May 1, 1991, 91-1 CPD ¶ 424 (protest sustained where record does not show that awardee's offer is technically acceptable in areas alleged by the protester); *Firth Construction Co., Inc. v.*

3 For example, under a solicitation for offers for leased office space, a proposal that failed to conform to material solicitation requirements for architectural elevation and landscape plans could not form the basis for award. *Marshall-Putnam Soil and Water Conservation Dist.*, B-289949, B-289949.2, May 29, 2002, 2002 CPD ¶ 90 at 5; *see also ALT Communications, Inc.*, B-246315, Mar. 2, 1992, 92-1 CPD ¶ 248 (holding that contracting agency improperly awarded a contract on the basis of initial proposals where low offeror failed to establish that its proposed telephone system conformed to all solicitation requirements).

*United States,* 36 Fed. Cl. 268, 272 (1996)(granting permanent injunction where bids failed conform to the essential requirement of the solicitation and was therefore nonresponsive); *ManTech Advanced Systems International, Inc.*, B-240136, October 26, 1990, 90-2 CPD ¶ 336 (protest that agency relaxed a solicitation requirement is sustained because requirement was mandatory). The clear position of the GAO and this Court in these cases is that an offeror's "price is irrelevant once a proposal is found technically unacceptable, [and] it cannot be considered for award." *Aid Maintenance Co., Inc.; TEAM Inc., supra* (citing *Nevada Automotive Test Center*, B-251137, Mar. 9, 1993, 93-1 CPD ¶ 216); *see also Firth Construction Co., Inc., supra.*

**a. Contiguous Space.**

The concept of contiguous space is a long-standing term of art in defining the federal Government's space requirements. Contiguous is defined in Black's Law Dictionary 290 (5th ed. 1979) as "...adjoining...touching at a point or along a boundary." "Contiguous" is applied by the Government to define space on a floor as "contiguous space," as well as to define space on more than one floor in a building as "contiguous floors." In *Mainmark Associates, Ltd.*, B-222454, 86-2 CPD 31 (July 3, 1986), the GAO denied a protest against the requirement for space to be on contiguous floors. In *Mainmark Associates*, the GSA noted that "contiguous space restrictions are not new ... and have been imposed because the use of less restrictive arrangements tends to make staff supervision and informal meetings more difficult." In addition, "GSA reported that security would be diminished without the restriction because it would be more difficult to control access to [more] floors." *Id.*

In this case, Section 1.1A.1 of the SFO [App. 012] specifically provides that the "offered space must be contiguous except where noted elsewhere in this solicitation." The GSA

contended in the agency report submitted to the GAO that 210 Earll has interpreted this requirement of the solicitation incorrectly. GSA's argument, however, is internally inconsistent, is not supported by the SFO, as amended, and is contrary to every explanation of the requirement previously provided to 210 Earll by GSA's representatives.

GSA cites to Section 10.2.1 of the Special Requirements, Attachment #1 to SFO No. 3AZ0031 [App. 052], as proof that GSA was looking for offers where the remainder of the space had some separation from the ground floor. 210 Earll concedes that the SFO did permit that Taxpayer Assistance Center be located on the "ground floor,"4 and that the remaining space be separated from the Taxpayer Assistance Center by being on the third floor or above. However, this is the only permitted exception to the requirement for "contiguous space" that is "noted elsewhere in the solicitation," as permitted under SFO Section 1.1A.1. Further, SFO Amendment No. 1 [App. 078-079] deleted the subparagraph of the Section 10.2.1 of the Special Requirements that indicated the balance of the space must be on the third level or above, but the amendment did not change the requirement in SFO 1.1A.1 that the space be contiguous except as noted, nor did it note that the space above the Taxpayer Assistance Center be non-contiguous. In fact, there is no reference in the SFO that permits the space above the Taxpayer Assistance Center to be on non-contiguous floors.

GSA argued that the interpretation of contiguous as "connected without separation" is more restrictive than the program needs of the IRS. GSA cited to dictionary references for the

---

4 / Section 1.1 of the SFO requires that the space be contiguous, except as noted, and makes no reference to permitting multiple buildings as meeting the space requirements. Specifically, Section 1.1B requires that the space be in a quality **building** (emphasis added). The only exception to the requirement for contiguous space is that the Taxpayer Assistance Center be located on the "ground floor." 4041 Central has offered space in two (2) separate buildings. There is no connection between these buildings, and the taxpayer Assistance Center is not located in the ground floor of the building housing the balance of IRS' space requirements. Nothing in the SFO, the Special Requirements, nor in the record supports the contention that the Taxpayer Assistance Center could be separated from the rest of the space being in a separate building, In this regard, GSA has accepted non-conforming space by ignoring the requirement that the Taxpayer Assistance Center be located on the ground floor of the building that is to house the balance of the government's space.

proposition that contiguous can also mean "near without connection." GSA rationalized that this definition is reasonable because the efficiency of space utilization is not going to be affected by a lack of touching between floors. As demonstrated by 210 Earll, however, GSA's argument is contrary to the traditional meaning of contiguous as previously advanced by GSA and entertained by the GAO in previous cases. *See Mainmark Associates*, *infra*. Further, GSA's argument was directly contrary to the instruction provided by its representatives to 210 Earll during discussions. GSA consistently advised 210 Earll throughout the procurement process that contiguous meant touching. This definition was stressed from the functionality and security related aspects of the space. From the security perspective alone, it makes no sense that GSA would request Level IV security on the one hand, and then permit the space to be broken up into three non-contiguous blocks that would expose Government employees to security risks as well as increase the costs of providing security at multiple locations.

The GAO has held that where a protester and agency disagree over the meaning of solicitation language, the GAO will resolve the matter by reading the solicitation as a whole and in a manner that gives effect to all its provisions. *Pro Constr., Inc.*, B-272458, Oct. 10, 1996, 96-2 CPD ¶ 141 at 3; *Lithos Restoration, Ltd.*, B-247003.2, Apr. 22, 1992, 92-1 CPD ¶ 379 at 4. To be reasonable, and therefore valid, an interpretation must be consistent with the solicitation when read as a whole and in a reasonable manner. *Allied Technology Group, Inc. v. United States*, 39 Fed. Cl. 125, 138 (1997); *Lithos Restoration, Ltd.*, *supra*. Applied to this case, the specific reference to contiguous space, as explained by GSA's own representatives and the noted importance of security as set forth in numerous SFO references (notably the five pages comprising Section 1.2.3 of the Special Requirements), it is inconsistent to believe that the solicitation did not require contiguous floors above the Taxpayer Assistance Center.

Accordingly, GSA's interpretation is not reasonable based on a reading of the solicitation as a whole. Therefore, the fact that 4041 Central's offer included non-contiguous space means that 4041 Central failed to meet a key minimum requirement of the SFO, and is therefore unacceptable.

**b. Secure Parking**

GSA defended the protest allegation that 4041 Central has a large public parking facility that cannot provide separate and secure parking for the Government by arguing that the awardee's offer did not take any exception to this requirement and must be read as including a commitment to meeting this requirement. GSA has never demonstrated, however, that the garage at 4041 Central can meet the SFO requirements. GSA argued only that it sees no reason to suspect the awardee's ability or commitment to meet this requirement. 4041 Central, the intervener, added that GSA could pay for alterations to the garage if necessary to meet the SFO requirements for secure parking. Based on the basic terms of the SFO and the uncontroverted facts of this case, GSA was required to determine that the garage could comply with the SFO or include the cost of such compliance in the award evaluation as demonstrated above. Because it did neither, however, GSA never established the requisite answer to "whether" or "at what cost" this mandatory requirement of the SFO could be met.

**c. Level IV Security Standards.**

GSA's defense of the protest allegation that 4041 Central cannot meet the Level IV security requirements is to deflect the challenge by querying whether 210 Earll can meet the requirements itself,5 and by referencing an attachment that was not provided to 210 Earll.

---

5 / GSA makes reference to the fact that 210 Earll is a "multi-tenant" facility. In fact, IRS has been the sole occupant of 210 Earll since 1992, and under the current SFO most of the space at 210 Earll is offered to GSA, including more than the 108,641 requested in the solicitation, to give GSA adequate security. Only a portion of the 1st floor that will have no access to the government's space and the 6th floor are not included. There is no

Specifically, the agency argues that "a Government security specialist has found awardee's property to be suitable for meeting Level IV security requirements [App. 128]" We did not receive, nor did we identify in the Agency Report any document or other due diligence study by GSA to determine whether 4041 Central can meet the Level IV security requirements, or at what cost they can be met. The contracting officer refers to an informal conversation with an unnamed individual concerning "security threat levels for both buildings," in the Statement of Relevant Facts [App. 141], but GSA is certainly aware that such informal comments pale in comparison to the requirement for a full-fledged security assessment.

4041 Central is a twenty story, multi-tenanted facility with no fencing, no set-backs, and no Level IV security infrastructure in place [Compare App. 178-182 to App. 052-058]. Since filing of the protest, we have learned that 4041 Central has leased 54,800 square feet at 4041 Central for a school that will have up to 500 students attending class at that location [App. 201-202]. Further, we received the security evaluation of 4041 Central from its own architect, Mr. Lendrum, as noted in the protest pleadings [App. 174-176], which demonstrates the inherent security risks at 4041 Central. Note that one of the key elements of the Level IV security is the requirement for only one (1) public entry point to the building, such that the Government can control and screen entrants to the building per Section 1.2.3.A of the Special Requirements [App. 054]. Mr. Lendrum notes that there are no less than EIGHT (8) access (ingress and egress) doors to the complex, none of which has controlled access as they all serve multiple tenants and visitors [App. 175].

**d. Seismic Standards.**

Section 2.2 of the SFO [App. 021], Seismic Safety for Existing Construction, is clear:

---

comparison between this tenant structure and multi-tenanted structure of 4041 Central, where the government twill occupy less than 25% of the complex and share access with dozens of other tenants, including a 500 student school.

> B. The Government intends to award a lease to an offeror of a building that meets the Seismic Standards. If an offer is received which meets the Seismic Standards and the other requirements of this solicitation, then other offers which do not meet the Seismic Standards will not be considered (emphasis added).

"Seismic Standards" as referred to in Section 2.2 means the Life Safety Performance Level of RP 6, unless otherwise specified. These standards are set forth in publications issued by the National Institutes of Science and Technology as referenced in the SFO [App. 203-228].

GSA has argued in response to the protest that 4041 Central has been found by a GSA engineer to meet the seismic standard. The contracting officer alleged in his Statement of Relevant Facts that the offer from 4041 Central submitted a Seismic Certificate that indicated full compliance [App. 135]. After best and final offers, GSA engaged in discussions with 4041 Central about this certificate, and additional documents were requested by GSA to be submitted within 60 days of award {App. 135]. In fact, the awarded lease was made "conditional" on GSA receiving the documents necessary to support the seismic certificate. On February 23, 2006, again after best and final offers and after award, GSA determined that 4041 Central's certificate was "deemed acceptable."

GSA engaged in post-BAFO discussions with 4041 Central in an attempt to correct its bid to meet the seismic standard. Further, as stated in Section 2.2 of the SFO, because 210 Earll did meet the seismic standard, the GSA should not have considered 4041 Central if at BAFO it was determined not to meet the seismic standard.

210 Earll submitted a seismic certificate with its offer executed by Paul G. Scott, of Caruso, Turley, Scott, Inc., noting that the building at 210 Earll will meet the seismic standard as required in Section 2.2 of the SFO. GSA accepted this certificate, and acknowledged at the

debriefing that there were no deficiencies in 210 Earll's offer. In fact, 210 Earll had programmed the funds necessary to meet the seismic standard in its rent offer.

There are exemptions in the Seismic Standards set forth in Section 1.3 thereof, including one called "Benchmark Buildings" [App. 215] The standards indicate that "the establishment of benchmark years that will automatically qualify buildings as being structurally adequate is complex," and "care must be taken in such comparisons to consider all possible variations of the building type studied." As stated in the standards, however, Benchmark Buildings do not "meet" the standards, they are exempt from them [App. 219].

210 Earll had been advised by Mr. Scott, 4041 Central's engineer that, in fact, 4041 Central's certificate had been rejected by GSA as it was determined that the building could not "meet" the standards[App. 229]. Mr. Scott indicated that GSA had advised 4041 Central that the building was not going to meet the standards, but they might be able to get it reclassified as a "Benchmark Building," using 1976 standards for a twenty story concrete sheer wall building. Mr. Scott advised that GSA worked on this for a few weeks and that they were really "helpful" in getting the building to "make the grade." In a conference call with the GAO on the protest, GSA counsel admitted that 4041 Central obtained the seismic certificate by being classified as a "Benchmark Building."

GSA's knowing acceptance of a building that does not meet the seismic standards, specifically Life Safety Performance Level of RP 6 as noted in Section 2.2 of the SFO, is an acceptance of a non-conforming offer that deeply prejudices 210 Earll. First, as a matter of contract, the SFO specifies that if an offer is received which meets the Seismic Standards and the other requirements of this solicitation, then other offers which do not meet the Seismic Standards will not be considered (emphasis added). 210 Earll meets the seismic standard. 4041 Central

does not meet the standard, i.e. Life Safety Performance Level of RP 6. Therefore, no award should have been made to 4041 Central. Also, 210 Earll in compliance with the SFO included the cost of meeting the standard in its bid price. 4041 Central, therefore, gained a competitive advantage by not having to factor such costs into its rent. In fact, the cost of making 4041 Central comply would likely be far greater than 210 Earll, since it is a high rise building built 10 years prior to 210 Earll.

Further, as the result of discussions after BAFO between 4041 Central and GSA, GSA has apparently determined that 4041 Central is "exempt" from the standards. We do not know this for certain, because GSA has not provided 210 Earll with the documents they considered. However, even if 4041 Central is exempt from the standards, it does not alter the contractual requirement of the SFO, which does not state that GSA will award a lease to a building that meets or is exempt from the standards. The SFO clearly requires that a building must "meet" the standards, which 4041 Central does not.

210 Earll submitted its offer in accordance with the SFO, and was required to include the cost of meeting the standards in its price. As revealed above, 4041 Central was treated differently by GSA, and was given a chance after BAFO to provide evidence that it was exempt. GSA's actions clearly are not permitted by the SFO, law or regulation, and as a result, the award to 4041 Central cannot be validated. Of course, these actions clearly prejudiced 210 Earll, as the most advantageous offeror, price and other factors considered, that had submitted a technically acceptable offer.

**e. Additional Non-conforming Items.**

In addition to the requirements discussed in detail above, 210 Earll has also alleged that 4041 Central cannot meet other minimum requirements of the SFO. Specifically, we cited the following SFO sections:

1. Section 5.7 Ceilings: Current ceilings are only 8' not 8'6" clear {App. 031}
2. Section 6.7 Heating and Air Conditioning [App. 038]
3. Section 6.17 Elevators: Cannot meet speed requirements {App. 041]

In the protest proceeding, GSA's defense with regard to these items in each case is that GSA has no reason to believe 4041 Central cannot meet the requirements of the SFO and the offeror has committed to meeting this requirement by executing the SFO and Lease. However, it is not clear on the record generated in the GAO protest proceeding that 4041 Central can affirmatively meet these listed SFO requirements. GSA failed to proceed with any due diligence to verify that a 25 year old speculative office tower can meet the current GSA building minimum requirements as set forth in the SFO, despite the fact that GSA is all too aware that its requirements exceed local building practices. As noted in Exhibit attached from Mr. Lendrum [App. 174-176], the architect for both buildings, 210 Earll was designed and constructed to meet the specific requirements of the federal Government while 4041 Central was not. The impact of the building's design affects its ability to meet the GSA minimum standards as set forth in Mr. Lendrum's report.

Ceiling Height. Mr. Lendrum advises that the ceiling height at 4041 Central was a design factor, and that the building would have to have been constructed 19 feet taller to achieve greater than the 8 foot ceilings it presently has.

Elevators. 210 Earll was designed to GSA's standards and has "far more capability" than 4041 Central. 210 Earll has four elevators serving 150,000 RSF, while 4041 Central has 6 elevators serving 400,000 RSF [App. 175]. The GSA standard for elevator speed, as set forth in

SFO Section 6.17.D requires that "passenger elevators have the capacity to transport in 5 minutes 15% of the normal population of all upper floors (based on 150 square feet per person). [See Protest Exhibit 1, p. 35, App. 042] Using GSA's standard, as noted in Mr. Lendrum's report, 210 Earll exceed the SFO requirements for elevator speed, while 4041 Central does not. This fact should have been the subject of due diligence by the GSA since it plans to occupy all of the highest floors in the building at 4041 Central.

Clearly, GSA relaxed its standards and accepted a non-conforming building in order to capitalize on the low price offered by 4041 Central. GSA did no due diligence and did not question 4041 Central on meeting these SFO standards. In fact, GSA even helped 4041 Central after BAFO so that their building could be considered "exempt" with regard to the Seismic Standards. GSA's acceptance of these deviations is directly prejudicial to 210 Earll, which meets each and every requirement of the SFO, without deviation. The acceptance by GSA of such deviations in part explains why the offered price by 4041 Central could be lower than 210 Earll; i.e GSA accepted space that was lower in quality than specified in the SFO. Accordingly, the acceptance of these deviations was not permitted by the SFO, and cannot be permitted in a valid lease award.

Accordingly, GSA's decision to award the lease to 4041 Central was therefore irrational, and agency's conduct was arbitrary, capricious and contrary to procurement law.

**4. An Award Letter is Not a Valid, Enforceable Contract**

The terms of the solicitation and precedent from this Court support 210 Earll's position that GSA's issuance of an award letter does not establish a valid contract between 4041 Central and the Government. Section 1.17 of the SFO establishes a distinction between a signed lease and mere acceptance of an offer. Subparagraph A of Section 1.17 indicates that "after

conclusion of negotiations, the Contracting Officer will require the Offeror selected for award to execute the proposed lease prepared by GSA which reflects the proposed agreement of the parties [App. 018] Thus, execution of a lease is the action that evidences the final agreement between the parties, and the SFO mandates that an executed lease is required to complete an award under the solicitation. Without a signed lease, the parties will not have completed negotiations, and any award letter will not contain the complete and final agreement of the parties.

Significantly, the SFO clarifies that a lease is necessary even if there is an award letter. Subparagraph C of Section 1.17 states that "the acceptance of the offer and award of the lease by the Government occurs upon notification of unconditional acceptance of the offer or execution of the lease by the Contracting Officer… [App. 018]." The subtle distinction here is that "award" of a lease may be evidenced by unconditional acceptance of the offer or execution of the lease, but a "lease" cannot exist without execution of a lease agreement by both parties. The Government may indicate its intention to award a lease through an award letter, but, until a lease is actually signed by the Government, the award is subject to termination and/or rescission because the parties have not reflected their agreement in a lease. This is true even where the proposed lease does not contain a termination for convenience clause.

This reasoning is supported by this Court's precedents. The Court held in Sterling-Kates v. United States, 12 Cl. Ct. 290, 34 Cont. Cas. Fed. (CCH) ¶75,286 (1987), that the existence of an award letter is not evidence of a valid contract in a negotiated lease procurement. In Sterling-Kates, the Court reviewed a claim by GSA that a valid contract came into being when it issued its acceptance of an offer to construct a building for the lease of the Government at the time an

award letter was issued, even though no lease was ever executed by the parties.6 The Court concluded that no valid contract was formed by the award letter. In fact, the Court held that GSA's argument that "a contract had been awarded when [the] offer had been accepted [in an award letter] would have true meaning only in the context of an advertised competitive procurement." Id. at p. 305. The Court determined that the award letter was merely another step in the negotiations. The negotiations were not deemed to be "completed" until there was a signed lease. Specifically, the Court stated:

> "A contract is formed at the conclusion of the negotiations when the parties have reached a meeting of the minds. (Frequently, the Government advises the contractor of this event by forwarding a document reducing all agreements to writing. When the contractor executes this document, and returns it to the Government, it submits its final proposal or "offer." Execution by the Government then constitutes the Government's "acceptance" of the proposal."
>
> Id. at p. 304.

Although the Government issued an award letter to 4041 Central, the parties have not taken the final and essential step of actually executing a lease. The essential step in this case is the execution of a lease by the parties, because it is the lease, not the award letter that represents the final agreement of the parties. The award letter is not the intended result of the procurement, and therefore, is not a valid and binding contract. The fact that an executed lease is required for a valid contract is also explained by the Claims Court in Essen Mall Properties v. United States, 21 Ct. Cl. 430 (1990).

The award letter [App. 276] indicates that GSA intends to accept 4041 Central's offer, and cites several economic terms of the offer. The award letter does not include each and every term of the lease, however, and even though GSA has not provided us with a copy of the

6 / The solicitation in the GSA procurement reviewed by the Court in Sterling-Kates, contained the same language as the instant SFO, i.e. that "unconditional acceptance of an offer ... establishes a valid contract." The existence of this language, as explained by the Court, did not overcome the fact that a valid contract could not be formed in the absence of a signed lease that represented the final agreement of the parties.

proposed lease, we know that there are at least the conditions related to the seismic certificate that are contained in the lease but not in the award letter. Further, there is a January 27, 2006 letter from Equis Corporation that included the lease packages for 4041 Central's review and signature [App. 277]. The January 27, 2006 letter indicates that after GSA "reviews" the signed lease, it will sign the lease and return a signed copy to 4041 Central. The fact that the lease had yet to be reviewed indicates that the proposed lease was not final. Further, because the January 30, 2006 award letter indicates that changes would only be recognized if approved by the contracting officer, there is an opening for changes to be considered. In any case, the letters are clear indications that the parties intended the signed lease to be the contract, rather than either of the letters submitted to 4041 Central by GSA or Equis Corporation.

Where an apparent award would be illegal, termination of an award is a viable and permissible remedy. The lease is the contract upon which the parties establish the terms of their agreement, and establish reliance on the performance of the other party in meeting its covenants and obligations. The award letter in this case, dated January 30, 2006, fails to convey the same status as a signed lease. Importantly, the award letter is not an unconditional acceptance of 4041 Central's offer establishing all of the terms of the lease; it is expressly conditioned on at least the execution of a lease. The Government's letters open the door for further negotiations and additional terms and conditions to be included in the actual lease which are not part of the award letter. Finally, neither the SFO nor the award letter itself indicates that the award letter forms a binding and non-terminable obligation of the parties in the absence of a signed lease. For all of these reasons, as noted in the Court's decision in Sterling-Kates, the award letter is not a valid and binding lease agreement. Therefore, the award may be terminated and/or rescinded by this Court.

**5. 210 Earll is Entitled to Receive the Lease Award**

Various equitable remedies have been fashioned by the courts upon a finding that there have been illegalities in the procurement process, including awarding the contract to the next lowest responsive bidder. *Buffalo Cent. Terminal v. U.S.*, 886 F.Supp. 1031 (1995), 1042-1043 (W.D. N.Y. 1995)(stating that "one available remedy would be to award the contract to the next, lowest responsive bidder) (*Action Service Corp. v. Garrett,* 790 F.Supp. 1188, 1197 (D. Puerto Rico 1992). When directing an agency to award a contract to the next lowest responsive bidder, the court is simply undoing the illegal actions of the agency, and instructing the agency to proceed with the procurement process. *Ulstein Maritime, Ltd. v. United States,* 833 F.2d 1052, 1058 (1st Cir.1987). A court may order that a contract be awarded to a specific party when "it is clear that, but for the illegal behavior of the agency, the contract would have been awarded to the party asking the court to order the award." *Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 204 (D.C. Cir. 1984). Here, it is clear that but for the illegal award to 4041 Central, 210 Earll would have received the award under the SFO as the next-in-line bidder. Accordingly, 210 Earll is likely to prevail on the merits and is likely to ultimately receive award of the lease.

**D. 210 Earll Will Suffer Irreparable Harm if the Lease is Signed and Partially Performed.**

210 Earll will suffer irreparable harm if an injunction is not issued and the Court allows GSA to execute the lease. Absent a termination for convenience clause in the standard GSA lease, the Government will be forced to nullify an existing lease and incur possible breach of contract damages under that lease before making award to 210 Earll. While this Court made clear in *Buffalo Cent. Terminal, supra,* that nullification of an executed lease and award to the next-in-line bidder is an available equitable remedy, that remedy is less likely than if the award letter is terminated before a contractual relationship has been established. *See Adelaide*

*Bloomfield Management Company*, B-253128.2, September 27, 1993, 93-2 ¶ 197 (stating that GAO is not authorized to terminate a lease without a termination for convenience clause because of costs attributable to the Government for possible breach of contract damages). As stated above, before the lease is signed, no contractual relationship exists between 4041 Central and the Government. *See Sterling-Kates, supra* (holding that existence of an award letter is not evidence of a valid contract in a negotiated lease procurement). Therefore, this Court can and should require the GSA to terminate and/or rescind its award to the apparently successful bidder, 4041 Central, and make the award to the lowest responsive bidder, 210 Earll, without the Government possibly incurring breach of contract damages.

Courts consider partial performance of a contract to be an important factor in the denial of equitable relief to frustrated bidders. *See, e.g., Buffalo Central Terminal,* 866 F.Supp. 1031, 1043 (W.D. N.Y. 1995) (citing *B.K. Instrument, Inc. v. U.S.*, 715 F.2d 713, 730 (C.A.N.Y. 1983)); *Keco Industries, Inc. v. Laird,* 318 F.Supp. 1361, 1364 (D.D.C.1970) (given partial performance of the contract, "only very serious Governmental irregularities will support injunctive relief"). Therefore, the equitable relief that 210 Earll is requesting from this Court, the nullification of lease award and award to next responsive bidder, becomes increasingly less likely once the lease is signed and partially performed. Accordingly, 210 Earll will suffer irreparable harm is the lease is executed and partially performed.

**E. The Balance of Hardships Tips in the Plaintiff's Favor.**

Under this factor, the Court must consider whether the balance of hardships leans in the 210 Earll's favor. *Seattle Sec. Services, Inc. v. U.S.*, 45 Fed. Cl. 560, 572 (2000). This requires a consideration of the harm to the Government and to 4041 Central if an injunction is granted. As the incumbent lessor who modified its building to meet the requirements of the IRS, 210 Earll

will certainly experience hardship if it is not awarded the lease and the IRS vacates 210 Earll's building. The loss of the IRS as a tenant cannot be adequately remedied, except by award of the lease.

The only harm that 4041 Central can claim it will incur as a result of this Court issuing an injunction preventing GSA from executing the lease is a delay in the conclusion of the award process pending this Court's review of Plaintiff's claims that the government's evaluation was flawed and that 4041 Central is a non-responsive bidder. However, because the awarded lease is not expected to commence until July 2007 at the earliest, and since the GSA lease with 210 Earll extends until September 2007, that harm is minimal. Indeed, this Court has on occasion been skeptical as to whether delay in transition, and associated costs and inconveniences, can outweigh a plaintiff's harms. *See PGBA, LLC v. United States,* 57 Fed.Cl. 655, 659, 663 (2004); *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 744(2000); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 399 (1999). As has been observed, "only in an exceptional case would [delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests." *Ellsworth Assocs.*, 45 Fed. Cl. at 399.

Indeed, much of the harm asserted by 4041 Central would have its natural counterpart in harm to the 210 Earll if a preliminary injunction and temporary restraining order is not granted, and could constitute harm to the Government if injunctive relief is denied. *University Research Co., LLC v. U.S.*, 65 Fed.Cl. 500, 514 (2005). This factor, as a practical matter, is for this reason usually dominated by the likelihood of success factor, and therefore tips in favor of 210 Earll. *Id.* Also, "an incumbent is likely to suffer potentially greater injury than a new bidder for a contract, based on the difference between the actual and the prospective: an incumbent's bid is based on keeping together a team whose existence is eliminated in the absence of injunctive

relief, while a new bidder is usually projecting the sort of team it could assemble if awarded the contract." *Id.* Accordingly, the hardships tip in favor of the incumbent lessor, 210 Earll.

Additionally, and as stated above, the Government's harm is actually minimized under a preliminary injunction as it will not be forced to incur breach of contract damages by later terminating a lease agreement as the result of its own flawed evaluation and award decision. The Government's harm is also minimized by this Court's awarding the lease to the bidder who meets all of the Government's requirements, 210 Earll.

**F. A Preliminary Injunction and Temporary Restraining Order is in the Public Interest**

A temporary restraining order and preliminary injunction which: (1) enjoins the GSA from signing the lease; and (2) corrects the illegal action of GSA and awards the lease to the next lowest responsive bidder, Plaintiff 210 Earll will serve the public interest.

The federal courts have repeatedly recognized that the public has an overriding interest in preserving the integrity of the procurement process by requiring the Government to follow its procurement laws and regulations. *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994); *see also, Hospital Klean of Texas, Inc.*, 65 Fed. Cl. 618, 624 (Fed. Cir. 2005)(granting temporary restraining order, in part, because of overriding public interest in prescribing integrity of procurement process by requiring Government to follow its regulations); *Seattle Security v. United States*, 45 Fed. Cl. 560, 572 (2000)("It is beyond peradventure that the public interest in honest, open and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluation a contractor's bid"); *Day Zimmerman Servs. v. United States*, 38 Fed. Cl. 591, 610 (1997)(same); *United Power Corp. v. United States*, 736 F. Supp. 354, 358 (D.D.C. 1990)(same).

In addition, and as stated above, if an injunction is not issued to prevent GSA from signing the lease, and in the absence of a termination for convenience clause in the standard GSA lease, the Government will be forced to nullify an existing lease and incur possible breach of contract damages under that lease before making award to 210 Earll. If the lease is not signed by GSA, it can be terminated and/or rescinded without the Government incurring potential liability. Further, the public interest would not be served by having the IRS located in a building, such as 4041 Central's, which does not conform to the IRS' requirements.

Accordingly, the public interest is served by this Court enjoining the GSA from executing the lease and making award to 210 Earll. The Court should therefore grant 210 Earll's request for a temporary restraining order and preliminary and permanent injunction.

**G. Plaintiff is also Entitled to Permanent Injunctive Relief and Declaratory Relief**

The next issue before the Court is whether to grant permanent injunctive relief. To obtain a permanent injunction, the Court must consider the following factors: (1) actual success on the merits; (2) whether 210 Earll will suffer irreparable injury if injunctive relief is not granted; (3) whether, if the injunction is not granted, the harm to plaintiff outweighs the harm to the Government and third parties; and (4) whether granting the injunction serves the public interest. *Hawpe Constr., Inc. v. United States,* 46 Fed.Cl. 571, 582 (2000) (citations omitted). Considering the analysis above, once this court determines that 210 Earll has succeeded on the merits, 210 Earll can show the final three (3) elements which entitled it to a permanent injunction. Each of these three elements is analyzed in detail above, in relation to 210 Earll's request for a preliminary injunction and temporary restraining order.

As for the first element, actual success on the merits, in a bid-protest matter, the Court may set aside an agency's procurement decision and grant declaratory relief if it is shown to be

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Bean Stuyvesant, L.L.C. v. U.S.*, 48 Fed.Cl. 303, 319 (2000) (citing 5 U.S.C. § 706(2)(A) (1994); 28 U.S.C. § 1491(b)(4)). As discussed above, GSA's decision to award the lease to 4041 Central is a violation of federal procurement law, and specifically the CICA and precedent of both the GAO and this Court, as it: (1) accepted a bid which did not conform to material terms of the SFO and awarded the lease on the basis of the nonconforming bid, and (2) performed and improper and prejudicial evaluation of the offers received. Accordingly, this Court should grant 210 Earll request for permanent injunctive relief, terminate and/or rescind the award letter to 4041 Central and award the subject lease to 210 Earll.

### H. Bond

Because neither 4041 Central nor the Government will suffer immediate cognizable damages as a result of the statutorily required relief 210 Earll seeks herein, the Court should not require a bond under Rule 65(c). Alternatively, if the Court does require a bond from 210 Earll under Rule 65(c), the Court should require a bond in a nominal amount, *e.g.*, $5,000 or less. *See, e.g., Hospital Klean of Texas, Inc.*, 65 Fed. Cl. at 625 (granting preliminary injunction motion and requiring a $2,674 bond); *DTH Management Gr'p*, 844 F. Supp at 257 (granting preliminary injunction and requiring $5,000 bond); *cf. Advanced Sys. Tech. Inc. v. United States*, No. 05-1167c, 2006 WL 172267 at 41 (Fed. Cl. Jan. 23, 2006) (issuing preliminary injunction enjoining award of contract and requiring $1,000 bond); *Aeroplate Corp. v. United States*, 67 Fed. Cl. 1, 4 (2005) (issuing preliminary injunction and requiring $2,000 bond).

## IV. Conclusion

210 Earll has: (1) made a showing that GSA's award to 4041 Central is arbitrary and capricious, an abuse of discretion, and violates CICA; (2) demonstrated that the balance of harms

weighs decidedly in 210 Earll's favor, and (3) established that the granting of a preliminary injunction, permanent injunction and a temporary restraining order serves the public interest. The Court, accordingly, should grant 210 Earll's Motion for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction and for Declaratory Relief and direct GSA not to execute the lease, declare 4041 Central's bid to be nonconforming, and award the lease to the lowest priced responsive bidder, 210 Earll.

Dated: May 8, 2006

Respectfully submitted,

Edward V. Gregorowicz, Jr.
The Law Offices of Edward V. Gregorowicz
10565 Lee Highway – Suite 102
Fairfax, Virginia 22030
Phone: (703) 934-6645
Fax: (703) 934-6649
*Counsel for Plaintiff 201 Earll, L.L.C.*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused copies of Plaintiff 210 Earll, L.L.C.'s foregoing Memorandum of Law to be served this 8 day of May 2006, by facsimile and U.S. mail, on:

Steven Mager, Esq.
United States Department of Justice
Commercial Litigation, Civil Division
8th Floor, 1100 L Street, NW
Washington, DC 20530
Fax: (202) 305-7643

Richard Moorhouse, Esquire
Greenberg Traurig, LLP
1750 Tysons Boulevard – Suite 1200
McLean, Virginia 22102
Fax: (703) 749-1301
*Counsel for the apparently successful offeror, 4041 Central Plaza, L.L.C.*

and via facsimile on:

Dan McPherson
Contracting Officer
General Services Administration
Fax: 602-514-7495

Edward V. Gregorowicz, Jr.