**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
Bid Protest

| | |
|---|---|
| 210 EARLL, L.L.C.,<br>*Plaintiff,*<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br>*Defendant,*<br><br>and<br><br>4041 CENTRAL PLAZA, L.L.C.,<br>*Intervenor.* | No. 06-360C<br><br>(Judge Baskir)<br><br>**REDACTED VERSION FOR PUBLIC RELEASE** |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF THE ADMINISTRATIVE RECORD**

Dated: June 20, 2006

Respectfully submitted,

s/ Edward V. Gregorowicz, Jr.
Edward V. Gregorowicz, Jr.
The Law Offices of Edward V. Gregorowicz, Jr.
10565 Lee Highway, Suite 102
Fairfax, Virginia 22030
Phone: (703) 934-6645
Fax: (703) 934-6649
*Counsel for Plaintiff 210 Earll, L.L.C.*

# TABLE OF CONTENTS

I. QUESTIONS PRESENTED .......... 2

II. STATEMENT OF THE CASE .......... 2

III. ARGUMENT .......... 16

A. Jurisdiction and Standing .......... 17

B. Standard of Review .......... 19

C. Plaintiff Prevails on the Merits of its Complaint .......... 21

1. The Government Failed to Make Award in Accordance with the Solicitation .......... 23

2. The Evaluation of 210 Earll's Price Proposal was Prejudicial and Improper .......... 29

3. 4041 Central Cannot Comply with the Minimum Requirements of the SFO, as Amended, and therefore 4041 Central is a Non-conforming Bidder that is not Eligible for Award .......... 36

a. Contiguous Space .......... 38

b. Secure Parking .......... 43

c. Level IV Security Standards .......... 44

d. Seismic Standards .......... 46

e. Additional Non-conforming Items .......... 48

4. The Award Letter is Not a Valid, Enforceable Contract .......... 51

5. 210 Earll is Entitled to Receive Lease Award .......... 56

D. 210 Earll Will Suffer Irreparable Harm if the Lease is Signed and Performed ........ 57

E. The Balance of the Hardships Tips is the Plaintiff's Favor ........ 59

F. A Permanent Injunction is in the Public Interest ........ 61

IV. CONCLUSION ........ 62

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Action Service Corp. v. Garrett,* 790 F.Supp. 1188 (D. Puerto Rico 1992); *reconsideration denied*, 797 F.Supp. 82 (D. Puerto Rico 1992) .......................... 57

*Allied Technology Group, Inc. v. United States,* 39 Fed. Cl. 125 (1997)............. 42

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). .............................. 19

*Bachy/Bauer/Green Joint Venture*, B-235950, Sept. 18, 1989, 89-2 CPD ¶ 240 ............................................................................................................ 29

*Bean Dredging Corp. v. U.S.*, 22 Cl. Ct. 519, 524 (1991) .................................... 59

*Buffalo Cent. Terminal v. U.S.*, 886 F.Supp. 1031 (W.D N.Y. 1995)................... 56

*CACI Field Servs., Inc. v. United States,* 854 F.2d 464 (Fed. Cir. 1988) ........... 20

*CESC Plaza Ltd. Partnership v. United States*, 52 Fed. Cl. 91 (2002) ............... 18

*Charles H. Tompkins Co. v. United States*, 43 Fed. Cl. 716, 719 (1999)...... 20, 21

*Chrysler Motors v. Auto Body Panels of Ohio,* 908 F.2d 951 (Fed. Cir. 1990)................................................................................................................ 21

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402 (1971).............. 20

*Delta Data Systems Corp. v. Webster,* 744 F.2d 197 (D.C. Cir. 1984)............... 57

*Dubinsky v. United States,* 43 Fed. Cl. 243 (1999) ............................................. 34

*Ellsworth Assocs., Inc. v. United States,* 45 Fed. Cl. 388 (1999)........................ 59

*Essen Mall Properties v. United States*, 21 Ct. Cl. 430 (1990) ........................... 54

*Firth Const. Co., Inc. v. U.S.*, 36 Fed. Cl. 268, 272 (1996) ........................... 37, 38

*For Your Information, Inc.*, B-278352, December 15, 1997, 97-2 CPD ¶ 164. ... 34

*Four Points By Sheraton v. United States.*, 66 Fed. Cl. 776 (2005).................... 18

*Gentex Corp. v. United States,* 58 Fed. Cl. 634 (2003) ...................................... 20

*Gemmo Impianti SpA,* B-290427, August 9, 2002, 2002 CPD ¶ 146 ................. 36

*Hawpe Constr., Inc. v. United States,* 46 Fed. Cl. 571 (2000) ............................ 21

*Isratex, Inc. v. United States,* 25 Cl. Ct. 223 (1992)........................................... 29

*ITT Federal Services Corp. v. U.S.*, 45 Fed. Cl. 174, 190 (1999) ....................... 34

*Joanell Laboratories et al.*, B-242415.3, May 1, 1991, 91-1 CPD ¶ 424 ............ 37

*Keco Industries, Inc. v. Laird,* 318 F.Supp. 1361, 1364 (D.D.C. 1970)............... 22

*Lion Raisins, Inc. v. U.S.*, 51 Fed.Cl. 238 (Fed. Cl. 2001) ................................. 20

*Lithos Restoration, Ltd.*, B-247003.2, Apr. 22, 1992, 92-1 CPD ¶ 379 ............. 42

*Mainmark Associates, Ltd.*, B-222454, July 3, 1986, 86-2 CPD ¶ 31 ................. 39

*ManTech Advanced Sys. International, Inc.*, B-240136, October 26, 1990, 90-2 CPD ¶ 336 ........................................................................................... 37

*Marshall-Putnam Soil.*, B-289949, B-289949.2, May 29, 2002, 2002 CPD ¶ 90 ............................................................................................................. 37

*McHugh/Calumet*, B-276472, June 23, 1997, 97-1 CPD ¶ 226 .......................... 28

*Nevada Automotive Test Center*, B-251137, Mar. 9, 1993, 93-1 CPD ¶ 216 ..... 38

*Northrup Grumman et. al.*, B-2955526 et. al., March 16, 2005, 2005 CPD ¶ 45 ........ 36

*Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147 (Fed. Cir. 1994)........ 61

*Pro Constr., Inc.*, B-272458, Oct. 10, 1996, 96-2 CPD ¶ 141 ........ 42

*Seattle Sec. Services, Inc. v. United States*, 45 Fed. Cl. 560 (2000)...... 58, 59, 61

*Sterling-Kates v. United States*, 12 Cl. Ct. 290, 34 Cont. Cas. Fed. (CCH) ¶ 75,286 (1987)........ 52, 53, 54, 55, 56

*World Travel Service v. United States,* 49 Fed. Cl. 431 (2001) ........ 19

*Ulstein Maritime, Ltd. v. United States,* 833 F.2d 1052 (1st Cir. 1987)........ 57

*United Int'l Investigative Servs., Inc. v. United States,* 41 Fed. Cl. 312 (1998) .. 59

*University Research Co., LLC v. U.S.*, 65 Fed. Cl. 500 (2005)........ 60

**FEDERAL STATUTES**

5 U.S.C. § 706 (2005)........ 20

28 U.S.C. § 1491 (2005)........ 16, 17, 20

31 U.S.C. § 3551 (2005)........ 18

40 U.S.C. § 3307 (2005)........ 19

41 U.S.C. § 253 (2005)........ 14, 21, 37

48 C.F.R. § 15.305(a) ........ 16

4 C.F.R. § 21........ 15

Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104-320, § 12(a), 110 Stat. 3870, 3874-75 (1996) ........................................................ 17

FAR § 15.506 ........................................................................................ 14

**MISCELLANEOUS**

R.C.F.C. 56.1 ........................................................................................ 1, 19

R.C.F.C. 65 ........................................................................................ 16

Blacks Law Dictionary 290 (5th ed. 1979) ........................................................ 38

In accordance with Rule 56.1 of the Rules of the United States Court of Federal Claims, hereinafter "RCFC," PLAINTIFF 210 EARLL, LLC ("Plaintiff" or "210 Earll"), through undersigned counsel, hereby submits this Memorandum in Support of its accompanying Motion for Judgment on the Basis of the Administrative Record. In the accompanying Motion, Plaintiff seeks judgment granting a Permanent Injunction: (a) prohibiting the General Services Administration ("GSA") from signing a lease agreement under Solicitation for Offers No. 3AZ0031 (the "SFO") with 4041 Central Plaza, LLC ("4041 Central"); (b) prohibiting GSA from proceeding otherwise to enter into a lease agreement under the SFO with 4041 Central; (c) canceling or abrogating any lease obligation(s) which might already exist between GSA and 4041 Central as void *ab initio;* and (d) directing GSA to award the subject lease to 210 Earll.

Plaintiff further respectfully asks the Court to declare the rights and obligations of the parties, and to enter an Order finding that: (a) 4041 Central submitted a non-conforming bid in response to the Solicitation for Offers No. 3AZ0031 ("SFO" or "solicitation"); (b) 4041 Central is accordingly ineligible to be awarded the subject lease; (c) 210 Earll, as second-in-line to be awarded the subject lease is entitled to receive the lease award; and (d) GSA must award the subject lease to 210 Earll.

## QUESTIONS PRESENTED

A. Whether the Court should declare that the GSA conducted a flawed evaluation that prejudiced 210 Earll.

B. Whether the apparently successful offeror, 4041 Central, submitted a non-conforming bid in response to the SFO and is the therefore ineligible to be awarded the subject lease.

C. Whether the Court should permanently terminate and/or rescind GSA's award to 4041 Central and award the lease to the second-in-line, acceptable offeror, 210 Earll, whose offer fully complies with the SFO without deviation.

## I. STATEMENT OF THE CASE

### A. Parties and the Contract Awardees

1. Plaintiff 210 Earll is a limited liability company, duly organized and existing under the laws of the State of Arizona. 210 Earll owns and operates commercial real property, located at 210 East Earll Drive, Phoenix, Arizona, where it currently is the incumbent lessor of office and related rental space to the United States Internal Revenue Service (the "IRS").

2. Defendant is the United States of America, acting by and through the GSA.

3. Intervenor Defendant 4041 Central was identified by GSA as the successful bidder under the SFO.

**B. The Solicitation, Lease Award and Protest**

4. The procurement of office space in Phoenix, AZ for the IRS began in early 2005. On or about March 3, 2005, GSA met with representatives of the IRS concerning the proposed IRS lease acquisition in Phoenix, AZ. One of the issues discussed at this meeting was the need for changes to a "submitted Prospectus" for this project. AR at 0049.

5. GSA and IRS met again on or about June 15, 2005, and identified the IRS space requirement as requiring "109,754 RSF/95,282 USF." Two issues raised at this meeting were the time table for approval of the Prospectus, and the fact that the space must include a Taxpayer Assistance Center that needed to be "contiguous with the entire facility." AR at 0051.

6. On or about August 15, 2005, GSA published a Presolicitation Notice for 107,192 RSF of "contiguous office and related space" in Phoenix AZ. AR at 0053. The stated requirement noted that "in addition to the contiguous space, some additional space and mail room space will be required on the first or ground floor." AR at 0053.

7. On or about October 2, 2005, the GSA issued Solicitation for Offers No. 3AZ0031, dated September 27, 2005, seeking bids from commercial landlords for approximately 108,641 RSF of office and related space, in the Central Business District of Phoenix, Arizona, for the IRS. AR at 0066-0317. The SFO specified that the "offered space must be contiguous except where noted elsewhere in this solicitation." AR at 0070.

8. The only references noted in the SFO for the required space that need not be contiguous were identified in Section 1.1A. of the SFO. AR at 0070.

9. A pre-proposal conference was held by GSA and IRS on October 18, 2005. GSA indicated in this conference that the rent for years 1 to 10 had to be flat, but that it would entertain a stepped rent for years 10 to 20 to "accommodate any changes in operating costs or taxes," in light of the fact as outlined in SFO Section 1.15 that "there will be no operating cost escalations or tax adjustments as part of this lease." AR at 0349.

10. On or about October 26, 2005, the IRS published notes of the pre-proposal conference, and indicated that the office requirement will be addressed as Level 4 security, because they did "not want to underestimate security as has previously happened in past projects." AR at 0351.

11. On or about October 25, 2006, GSA issued SFO Amendment #1 to the offerors. AR at 0362-0373.

12. On or about November 7, 2005, GSA received 3 offers in response to the SFO. The three offerors were 210 Earll, NGP Grace Court Phoenix III, LLC, and Transwestern. AR at 0401-0999.

13. Transwestern offered the building at 4041 Central, and included a marked-up SFO indicating changes to the stated requirements. AR at 0873-0915.

14. 4041 Central checked "Substantial Compliance" in the Accessibility Award Factor in Section 2.1 of the SFO in its offer. AR at 0885.

15. 4041 Central changed the minimum live load capacity requirement from 80 pounds to 70 pounds in its offer. AR at 0893.

16. SFO Section 1.5 provided that the government "may terminate this lease anytime after the ten year firm term on 90 days. AR at 0879. 4041 Central changed the termination notice requirement in their offer to 270 days. AR at 0918.

17. A description of the building included in 4041 Central's offer, AR at 0986-0990, identified several notable deficiencies in the building. The building was constructed pursuant to the City of Phoenix construction

 REDACTED FOR PUBLIC RELEASE

code that differs significantly from the current adopted Uniform Building Code. AR at 0986. **[REDACTED]**. *Id.* **[REDACTED]**. AR at 0987. **[REDACTED]**. *Id.* **[REDACTED]**. AR at 0988. **[REDACTED]**. AR at 0989.

18. As of November 3, 2005, the GSA Capital Investment & Leasing Division was still pursuing a Prospectus for the Phoenix IRS lease requirement. AR at 1004.

19. On November 9, 2005, after receipt of initial offers under the SFO, GSA indicated that the IRS lease should be taken off the Prospectus list because they determined "it will be below prospectus after all." AR at 1002. GSA's understanding of the prospectus requirement at this time, however, was incorrect because it was based on the incorrect threshold of $2.6 million. AR at 1000. GSA's understanding was communicated to the IRS in a meeting on or about November 18, 2005, wherein it was concluded that there were "no issues with the offerors being under prospectus." AR at 1018.

20. On or about November 10, 2005, IRS attempted to clarify the security status of the IRS lease by questioning why the security standard had to be Level 4. AR at 1005-1006. The United States Federal Protective Service ("FPS"), however, determined that the IRS requirement was Level

 **REDACTED FOR PUBLIC RELEASE**

4 "based upon historical factors, law enforcement in the building, [the agency's] mission, the size of personnel visiting and employees working in the facility." AR at 1005.

21. On or about November 22, 2005, Equis, GSA's broker representative, was made aware that the prospectus threshold was actually lower than previously disclosed, $2.41 million instead of $2.6 million. Equis advised GSA that this discovery "was not going to be a problem," because the "relocation offer for 4041 Central has a net rent of **[REDACTED]**." AR at 1059.

22. On or about November 28, 2005, GSA's broker representative advised 210 Earll that the proposed layout of the Taxpayer Assistance Center at 210 Earll would not meet the requirement in the SFO for contiguous space because it was in two blocks separated by a hallway. AR at 1088.

23. On or about November 29, 2005, GSA issued Amendment #2 to the SFO. AR at 1096-1107.

24. On or about November 30, 2005, representatives of 4041 Central expressed concerns via E-Mail about their ability to meet certain SFO minimum requirements. Specifically, 4041 Central was aware that their drawings listed the live load capacity for the building at 70 pounds,

 REDACTED FOR PUBLIC RELEASE

instead of 80 as required by the SFO. AR at 1112. They described this as a "super critical deal killer point." *Id.*

25. On or about December 5, 2005, GSA became concerned about the "looseness" of the security requirements in the Special Requirements appendix to the SFO, but GSA's broker representative concluded that these concerns should not have much impact on the offers "since most of these costs are to be TI costs." AR at 1462-1464.

26. On or about December 6, 2005, 4041 Central supplemented its offer under the SFO. AR at 1281-1461. This supplemental offer includes a "clean" copy of the SFO with all notations removed, AR at 1281-1324, but there is no cover letter or other affirmative statement by 4041 Central included that acknowledges all prior objections and changes to the SFO have been withdrawn and/or that the building will meet the SFO terms without exception.

27. 4041 Central's supplemental offer includes the same building description and narrative citing the same deficiencies that was included in its initial offer, AR at 1347-1350.

28. On or about December 13, 2005, 4041 Central advised GSA's broker representative that a seismic engineer would be conducting an

 REDACTED FOR PUBLIC RELEASE

analysis of the building's seismic compliance during the first week of January 2006. AR at 1475.

29. On or about December 15, 2005, 4041 Central provided a Certificate of Seismic Compliance signed by Paul G. Scott indicating that the certificate was based on ICSSC Table 1.1 and the building's classification as a "Benchmark Building." AR at 1488.

30. On or about December 19, 2005, GSA requested revised final offers from the offerors by the close of business (5:00 PM) on December 30, 2005. AR at 1499-1504.

31. On or about December 19, 2005, 210 Earll requested that GSA confirm that the prospectus rent threshold as $2.47 million as stated verbally by Equis. AR at 1506. This requested was re-iterated on December 20, 2005. AR at 1518.

32. On or about December 20, 2005, prior to the date for receipt of revised final offers, Equis documented that it had checked on certain references for 4041 Central. AR at 1521-1522. There is no evidence that either Equis or GSA similarly checked on any references for 210 Earll.

33. On or about December 21, 2005, GSA, IRS and Equis acknowledged that 4041 Central had not yet satisfied the SFO requirement for seismic certification. AR at 1485.

34. On December 22, 2005, 210 Earll once again requested clarification of the prospectus threshold from Equis. AR at 1548.

35. On December 22, 2005, Equis responded to 210 Earll's requests for clarification of the prospectus requirement by stating that the applicable threshold was $2.47 million net rent, and further stating that it was GSA's expectation that "this acquisition will result in a lease below this prospectus threshold." AR at 1551.

36. On December 23, 2005, GSA determined that the seismic certificate submitted by 4041 Central was "unacceptable." AR at 1554.

37. On December 29, 2005, 210 Earll submitted its revised final offer to GSA. AR at 1560-1584. 210 Earll's offer included a rent computation sheet that broke down the offered rent into its various components and demonstrated the net rent offered for comparison to the previously announced prospectus threshold ($2.47 million). AR at 1569. As shown in this rent computation, the net rent offered was below the stated prospectus threshold of $2.47 million.

38. On December 30, 2005, Transwestern submitted a final revised offer for 4041 Central. AR at 1619-1874. In it final revised offer, 4041 Central stated that "the prospective tenant and its agents/representatives are ultimately responsible to independently verify the suitability of the

premises for occupancy by the proposed tenant." AR at 1619. This is the same language that was included in 4041 Central's initial offer and objected to by GSA.

39. 4041 Central's final revised offer included the Prelease Exhibits (Checklists) for Fire Protection & Life Safety Evaluation. AR at 1766-1777. 4041 Central failed to sign the Offeror's Statement of Correction indicating its acceptance of the requirement that the building be brought into compliance with the applicable criteria at the offeror's sole cost and expense. AR at 1777.

40. On or about January 3, 2006, and after the time for receipt of revised final offers, GSA forwarded to 4041 Central its determination that the seismic certificate submitted by 4041 central was unacceptable. AR at 1875.

41. In a memorandum dated December 30, 2005, from Equis to 4041 Central, AR at 1884-1889, Equis notes in item 2 as "DONE" that certain language was removed from 4041 Central's offer. AR at 1884. However, to the contrary, this same language was re-inserted in 4041 Centrals' final revised offer. AR at 1619.

42. Equis apparently prepared the price evaluation on the final revised offers received under the SFO. Equis' evaluation of 4041 Central's

price indicates a "Total Per Usable Square Foot Present Value Per Year of **[REDACTED]**." AR at 1894. **[REDACTED]**.

43. Equis apparently prepared a price evaluation of 210 Earll's price that indicates a "Total Per Usable Square Foot Present Value Per Year of **[REDACTED]**." **[REDACTED]**.

44. Equis apparently prepared a "Prospectus Level Computation" on the final revised offers received under the SFO. Equis' evaluation of 201 Earll's offer ignores the adjusted operating costs noted in 210 Earll's offer for years 11 to 20, and refers to $2,470,000 as the prospectus threshold. AR at 1907. Equis also determined that the rent offered by Grace Court **[REDACTED]**," even though the rent offered is "higher than 210 Earll." AR at 1908.

45. On or about January 6, 2006, Equis contacted 4041 Central by telephone, and advised that if 4041 Central was awarded a lease, "the seismic compliance would be made a condition of award." AR at 1965.

46. Equis apparently prepared an abstract of the offers received under the SFO. AR at 1966. This abstract includes no evaluation of the award factors identified in the SFO.

47. Equis apparently prepared a price negotiation memorandum dated January 12, 2006. AR at 1967-1979. This price negotiation

memorandum appears to have been authored after receipt of all offers, and contains factual inaccuracies. Prior to receipt of offers, Equis had indicated that the proposed rental range would be **[REDACTED]** per square foot, AR at 0351, yet the target range mentioned in the memorandum is for a reduced amount, i.e. **[REDACTED]** per square foot. AR at 1967. Also, the memorandum indicates that "prospectus approval has not been sought," yet a prospectus was being pursued until initial offers were received. AR at 1004.

48. On or about January 17, 2006, GSA indicated in an E-Mail that the selection of the new location for the Phoenix location would be announced on January 25, 2006. AR at 1987-1988.

49. On or about January 27, 2006, Equis advised 4041 Central in an E-Mail that its offer had been selected for award under the SFO. AR at 1993. The E-Mail included an electronic copy of a cover letter and notice that the proposed lease documents would be delivered by overnight mail on January 30, 2006. *Id.*

50. On January 27, 2006, 210 Earll delivered in writing to the contracting officer a written request for a debriefing in accordance with FAR § 15.506 and U.S.C. 253b(e). AR at 1992.

51. On or about January 30, 2006, the GSA contracting officer sent a letter to 4041 Central. AR at 2000. The contracting officer's letter indicated that GSA would not "recognize any changes to the Lease unless authorized in writing by the Contracting Officer." *Id.*

52. The draft lease prepared by GSA and delivered to 4041 Central permitted 4041 Central to submit a revised certificate of seismic compliance "no later than 60 calendar days from the date of lease award." AR at 2004.

53. GSA provided 210 Earll with a statutory debriefing on February 1, 2006. AR at 2247. 210 Earll was advised at the debriefing that it had submitted the second-lowest priced offer of three offerors that submitted bids under the SFO, and that there were no deficiencies in 210 Earll's offer. AR at 1966.

54. On February 6, 2006, 210 Earll timely filed a bid protest with the United States General Accountability Office (the "GAO"), pursuant to 4 C.F.R. Part 21, GAO Protest No. B-297953. AR at 2251-2256.

55. On February 24, 2006, GSA requested that GAO summarily dismiss the protest, alleging that 210 Earll was not an interested party on grounds that 210 Earll's offered rent exceeded the prospectus threshold of $2,410,000.00. AR at 2290-2299.

56. 210 Earll responded to the GSA request for summary dismissal on February 28, 2006. AR at 2301-2322. 210 Earll argued that the Prospectus requirement did not preclude award to 210 Earll, and further, that 210 Earll's offered net rent was below the appropriate threshold. *Id.*

57. GSA filed a rebuttal with the GAO on March 2, 2006. AR at 2327-2330.

58. On March 3, 2006, GAO denied GSA's request for summary dismissal, and ruled that 210 Earll was an interested party to challenge the award to 4041 Central. AR at 2688.

59. In a conference call held on April 24, 2006, counsel for the GAO informed counsel GSA, 210 Earll and 4041 Central of its intention to sustain the protest. GAO advised that 210 Earll was an interested party, and that GSA's flawed evaluation had prejudiced 210 Earll.

60. On May 5, 2006, GAO issued a Decision on 210 Earll's protest of the lease award to 4041 Central. AR at 2685-2687. In its Decision, GAO determined that the protest was "academic" because GSA had agreed to pay 210 Earll its bid preparation cots and the costs of filing its protest, including reasonable attorneys' fees. AR at 2686.

61. The current lease between GSA and 210 Earll will not expire by its terms until September 17, 2007.

 **REDACTED FOR PUBLIC RELEASE**

## II. ARGUMENT

The Court may issue the relief requested, including a permanent injunction and declaratory relief pursuant to Rule 65(a) of the RCFC and 28 U.S.C. § 1491(b)(2). The Court should grant 210 Earll's request for injunctive and declaratory relief enjoining GSA from executing the subject lease, rescinding the illegal award to 4041 Central and awarding the lease to the second-in-line, acceptable offeror, Plaintiff 210 Earll, because, as shown below: (1) GSA failed to make the award in accordance with the solicitation; (2) GSA's evaluation of the bids was improper and prejudicial to 210 Earll; and (3) the apparently successful bidder, 4041 Central, did not comply with the minimum requirements of the SFO, and, therefore, 4041 Central is a non-conforming bidder that is not eligible for award. GSA's decision to award the lease to 4041 Central was therefore irrational, and agency's conduct was arbitrary, capricious and contrary to law. Moreover, based on the precedents of this Court, the award letter issued to 4041 is not an enforceable contract and 210 Earll is entitled to receive the award.

### A. Jurisdiction and Standing

This Court has jurisdiction over this bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1), amended by the Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104-320, § 12(a), 110 Stat.

3870, 3874-75 (1996). The Tucker Act grants the Court jurisdiction over "an action by an interested party objecting to...any alleged violation of statute or regulation in connection with a procurement." 28 U.S.C. § 1491(b)(1).

The Federal Circuit has construed "interested party" under ADRA to comport with "interested party" as defined in the Competition in Contracting Act of 1984 ("CICA"), 31 U.S.C. § 3551. *Four Points By Sheraton v. U.S.*, 66 Fed. Cl. 776, 783 (2005). CICA defines an "interested party" as an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or failure to award the contract." 31 U.S.C. § 3551(2)(A) (2000). To establish the requisite standing necessary to challenge a contract award, a disappointed bidder must show that there was a "substantial chance" that it would have received the award but for the alleged error in the procurement process. *Four Points Sheraton,* 66 Fed. Cl. at 783.

210 Earll was the offeror second in line for award (out of 3), and had the agency properly evaluated the offers submitted, 210 Earll would have been selected for award. Accordingly, there was a substantial chance that 210 Earll would have received the award but for GSA's error in declaring that 4041 Central was the successful bidder. Therefore, 210 Earll is an

interested party and has standing to bring this bid protest. *See, e.g., CESC Plaza Ltd. Partnership v. U.S.*, 52 Fed. Cl. 91, 93 (2002) (Plaintiffs were finalists in the competition for the lease under the original SFO and therefore had standing).

GSA contested 210 Earll's standing at the GAO, based upon GSA's argument that the application of the prospectus threshold by the contracting officer resulted in a determination that GSA could not accept 210 Earll's offer without a Resolution from the Congressional Committees assigned to review lease prospectuses under 40 U.S.C. §3307(a)(2). AR at 2290-2299. However, the GAO did not accept GSA's argument, and held that 210 Earll was an interested party. AR at 2688. This determination was further explained by GAO counsel during a conference call with counsel on April 24, 2006.

In summary of the arguments, neither the relevant statute nor the SFO contains any reference that stipulates GSA may not award a lease to an offeror in the event that it is determined the net rent of the offer exceeds the appropriate prospectus threshold. In fact, as demonstrated in 210 Earll's offer, the net rent offered by 210 Earll falls below the applicable prospectus threshold in this case. AR at 1569.

### B. Standards of Review

Motions for judgment on the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1; *World Travel Service v. United States,* 49 Fed. Cl. 431, 438 (2001). Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The inquiry for motions for summary judgment on the administrative record is whether, given all the facts and even disputed facts, a protestor has met its burden of proof that an award is arbitrary and capricious or contrary to law. *Lion Raisins, Inc. v. U.S.*, 51 Fed. Cl. 238, 247 (Fed. Cl. 2001). The standard of proof in a bid protest case is a preponderance of the evidence. *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed. Cir. 1988).

In a bid protest, the court reviews the agency's decision under the standards in the Administrative Procedure Act (APA), 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4). The APA directs a reviewing court to overturn an agency action that is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). In order to meet this standard, "the protestor must show by a preponderance of the evidence that the agency's actions were either without a reasonable basis

or in violation of applicable procurement law." *Gentex Corp. v. United States,* 58 Fed. Cl. 634, 648 (2003) (citations omitted).

While the agency's decision is entitled to a "presumption of regularity," *Charles H. Tompkins Co. v. U.S.*, 43 Fed. Cl. 716, 719 (1999) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415 (1971)), that presumption does not shield the agency's decision from a "thorough, probing, in-depth review." *Id.* Although the court "recognize[s] the relevant agency's technical expertise and experience, and defer[s] to its analysis unless it is without substantial basis in fact," *Charles H. Tompkins Co.,* 43 Fed. Cl. at 719, the court must also perform an informed review of even technical decisions in order to meaningfully exercise its jurisdiction. *Id.* Pursuant to the CICA, the Government is required to specify its needs and solicit proposals "in a manner designed to achieve full and open competition for the procurement." 41 U.S.C. § 253(a)(1)(A) (2000).

To gain a permanent injunction the plaintiff must establish: (1) success on the merits; (2) that it will suffer irreparable injury if injunctive relief were not granted; (3) that, if the injunction were not granted, the harm to plaintiff outweighs the harm to the Government and third parties; and (4) that granting the injunction serves the public interest. *Hawpe Constr., Inc. v. United States,* 46 Fed. Cl. 571, 582 (2000) (citations omitted). None of

the four factors, standing alone, is dispositive; thus, "the weakness of the showing regarding one factor may be overborne by the strength of the others." *Chrysler Motors v. Auto Body Panels of Ohio,* 908 F.2d 951, 953 (Fed. Cir. 1990).

**C. Plaintiff Prevails on Merits of its Complaint.**

210 Earll will prevail because the Agency's actions were arbitrary, capricious, or not in accordance with procurement regulations. In reviewing this, the court looks at several criteria, any one of which is enough for the Plaintiff to prevail, including the following: (1) was there a reasonable basis for the procurement decision; (2) did the procuring officials abuse its discretion; and (3) were pertinent statues and regulations violated. *Keco Indus., Inc. v. United States*, 203 Ct. Cl. 566 (1974). In this case, as evidenced below, the Agency's actions fail all three tests as its actions were both arbitrary and capricious, lacked a reasonable basis and were not in accordance with relevant procurement law.

After all filings in the GAO Protest and a conference call with the GAO and counsel, the GSA agreed to pay 210 Earll its bid preparation costs and attorneys fees. AR at 2682-2684. This concession was made in recognition of the fact that the GAO had determined 210 Earll to be an interested party and would have sustained the protest. In subsections (1)

through (3) below, Plaintiff 210 Earll demonstrates in the same manner as determined by the GAO that it succeeds in showing that GSA's award to 4041 Central was arbitrary, capricious and contrary to procurement law, specifically the CICA and precedent from this Court and the Comptroller General. In subsections (4) and (5) below, Plaintiff 210 Earll demonstrates that 210 Earll is entitled to the injunctive and declaratory relief which it requests in its Motion.

**1. The Government failed to make award in accordance with the evaluation factors in the solicitation.**

The solicitation specified in Section 2.3 [See page 14 of Protest Exhibit 1, App. 021] that:

> The lease will be awarded to the Offeror whose offer will be most advantageous to the Government, price and other award factors which follow considered. The other factors are as follows:
>
> 1. Quality of Space
> 2. Past Performance of Offeror and other Key Personnel (i.e. architect, engineer, lead designer etc.) on Comparable Projects
> 3. Past Performance of Offeror in Managing and Operating Comparable Facilities

The "Other Factors" indicated in Section 2.3 were in addition to the Award Factors set forth in Section 2.1 "Accessibility" and Section 2.2 "Seismic Safety for Existing Construction." Accordingly, it is clear in the SFO that the award decision was not going to be on the basis of price

alone. The Administrative record is replete with requests by GSA for the offerors to address each of these award factors in the offers submitted under the SFO.

Contrary to the clear language in the SFO, the proposed lease award to 4041 Central was not based on any evaluation of the award factors set forth in the SFO. In fact, the record lacks any contemporaneous evaluation documentation on the offeror's submissions on the award factors or compliance with the "other factors" identified in the SFO. In the GAO Protest, GSA admitted that there was no such record of an evaluation of the offerors in accordance with the SFO. AR at 2564. GSA instead argued to the GAO that the lack of evaluation did not prejudice 210 Earll.

The lack of a reasoned evaluation of the award factors in this case seriously prejudiced 210 Earll. The GSA defense stated in the GAO Protest, that the "other factors" set forth in SFO Section 2.3 were evaluated and that both 210 Earll and 4041 Central were at least "equal," was clearly a post-facto attempt to justify an award that was based entirely on price. Without an attempt to rank the three (3) offerors, GSA implied that "no deficiencies" meant "equal." Yet, the offers were not equal as set forth in the Administrative Record.

210 Earll was rated as a class "A" building by the local real estate clearing house CoStar. AR at 1571. 4041 Central on the other hand was rated as a class "B" building. AR at 1578. 4041 Central's offer included evidence of the lesser quality of its building. AR at 0986-0990. Specifically:

(i) 4041 Central was constructed pursuant to a construction code that differs significantly from the current Uniform Building Code, AR at 0986;

(ii) **[REDACTED]**;

(iii) **[REDACTED]**, AR at 0987;

(iv) **[REDACTED]**, AR at 0987;

(v) **[REDACTED]**; and

(vi) **[REDACTED]**, AR at 0989.

The discrepancy in quality between 210 Earll and 4041 Central was further espoused in the words of the architect who designed both buildings. AR at 2493-2495. Notably, 210 Earll was designed to meet the specific specifications of the GSA, AR at 2493, whereas 4041 Central was not. Further, 4041 Central provided GSA with notice of other potential differences in quality in the notations provided in the SFO included in its offer. 4041 Central had checked that it only was in "substantial compliance" with the accessibility factor set forth in Section 2.1 of the SFO.

AR at 0885. 210 Earll offered a building that was in full compliance with the accessibility standard. 4041 Central also indicated in its offer that the building could not meet the minimum live load capacity requirement of the SFO, which it annotated and changed from 80 to 70 pounds, AR at 0893, and later described the 80 pound requirement as a "super critical deal killer point." AR at 1112. 210 Earll met these requirements without deviation.

Despite the existence of these differences in quality as readily seen from the Administrative Record, GSA did not evaluate the buildings on the basis of quality as set forth in the SFO. Since 210 Earll had a higher quality (Class "A") building, the failure to provide a technical evaluation in accordance with the SFO directly prejudiced 210 Earll.

As with the quality of space factor, there is no evidence anywhere in the Administrative Record that GSA conducted any evaluation of the past performance of the offerors. In the GAO Protest, GSA offered a post-facto analysis to argue that past performance would not have affected the outcome of the award decision because 210 Earll was no better than equal to 4041 Central. In assessing the importance of the evaluation of past performance on comparable projects, the agency argued that the contracting officer was reasonable in concluding that both awardee and the protester provided excellent teams that are highly likely to be successful in

this project. AR at 2342-2346. With regard to past performance in managing and operating comparable facilities, the agency argued that the contracting officer reasonably concluded that the past performance of awardee was excellent and that a thorough investigation of protester's past performance could not affect the award decision. *Id.* In both cases, the agency relied on the contracting officer's assessment of the "experience" of the offerors. Specifically, the contracting officer determined that the past performance of both 210 Earll and 4041 Central as to key personnel on similar projects was "equal" based on the experience in performing similar projects. But admittedly, the contracting officer did not check 210 Earl's references, nor conduct any objective analysis of the teams offered by 210 Earll or 4041 Central. Thus, GSA did not actually perform a past performance evaluation as part of the award decision.

The Administrative Record contains only one reference to any review of the past performance of the teams submitted by the offerors under the SFO. GSA, by its own admission in the GAO Protest, never actually evaluated 210 Earll's "past performance." Specifically, only Equis made three (3) phone calls to check on certain references for 4041 Central on December 20, 2005. AR at 1521-1522. These three phone calls fall well short of any reasonable past performance evaluation of the offeror's key

personnel or management of comparable facilities. Accordingly, it is clear that GSA made no attempt to verify or equate the relative strength of the past performance of the offerors. GSA, therefore, had no basis to compare 4041 Central to 210 Earll, because none of 210 Earll's references was contacted.

In the GAO Protest, GSA argued that 4041 Central's past performance was evaluated as good, and that 210 Earll's was either equal or neutral. However, this evaluation is not evident in the Administrative Record. In making this post-facto analysis, GSA offered no reasonable proof that there were no material differences between 4041 central and 210 Earll that may have affected the award decision. The broad-brush conclusion that these offerors were equal after the fact was a "macro" justification, rather than a fair and objective up-front evaluation. Further, to the extent that GSA attempted after the fact to raise concerns about 210 Earll, it ignored the requirements of FAR § 15.610(c)(6) to provide 210 Earll with an opportunity to discuss past performance information obtained from references as part of the procurement process. *See McHugh/Calumet*, B-276472, June 23, 1997, 97-1 CPD ¶ 226. Accordingly, GSA's failure to adequately consider past performance as part of the award decision was improper and unfairly prejudiced 210 Earll.

Where, as here, a solicitation indicates that price will be considered but does not indicate the relative importance of price and technical factors, they are considered approximately equal in weight. *Isratex, Inc. v. United States*, 25 Cl. Ct. 223, 229 (1992) (citations omitted); *Bachy/Bauer/Green Joint Venture*, B-235950, Sept. 18, 1989, 89-2 CPD ¶ 240. In making the award decision, GSA gave no weight to the technical factors. This deficiency renders the award decision arbitrary and capricious, and an abuse of discretion by the agency.

**2. The evaluation of 210 Earll's Price Proposal was prejudiced and improper.**

The price evaluation of the offers in this procurement consisted of a net present value calculation and a prospectus rent comparison prepared by Equis, GSA's broker representative. As evidenced by the complete Administrative Record, there was no attempt by GSA to adjust the price evaluation for the actual costs to be incurred by the government under the offers submitted by 210 Earll and 4041 Central. In this regard, GSA failed to follow the terms of the SFO, as well as established precedent that requires the government to conduct a fair price evaluation.

In the GAO Protest, GSA confirmed that in making the award decision the contracting officer did not factor the costs of moving or relocation from 210 Earll in 4041 Central's net present value price

 REDACTED FOR PUBLIC RELEASE

evaluation. AR at 2346. In the Statement of Relevant Facts provided to the GAO, the contracting officer concedes this point as an "oversight," and provided a re-computed net present value computation. AR at 2357-2366. This re-computed price analysis, however, was based on certain unfounded "assumptions" that were neither explained nor linked to the actual costs of relocating the IRS from 210 Earll. AR at 2476-2480. As explained in the GAO Protest, the actual relocation costs would be far greater than GSA has proffered to the GAO had the agency conducted a fair and reasonable evaluation of the factors in this case. AR at 2480.

Further, GSA's price evaluation was flawed because it did not take into consideration the difference in lump sum costs to be borne by the government that would be incurred as the result of a move to 4041 Central. In the agency report to the GAO, the GSA contracting officer advised that no lump sum costs have been included in the net present value computations, because GSA does not have a basis for assuming that tenant improvements will cost more at one building than the other. AR at 2346. However, as demonstrated in the Administrative Record, GSA had knowledge that there are significant differences in the lump sum costs that will be incurred by the Government in a move to 4041 Central.

GSA included a tenant improvement allowance of $36.00 per square foot in the SFO, AR at 0073, and the SFO indicated that any costs in excess of this allowance would be reimbursed lump sum by the government. AR at 0074. The tenant improvement allowance was intended to cover all costs identified in the SFO as "tenant improvements," as well as all costs related to the Level IV Security requirements set forth in the special requirements section of the SFO. In the GAO Protest, GSA argued that it had no basis to believe that the costs would be any different at either 210 Earll or 4041 Central, but the Administrative Record contains no reasonable explanation or analysis of the costs that would likely be incurred at either location that substantiates this argument. In fact, it is *per se* irrational for GSA to conclude that the tenant improvement and security costs could be the same in two very different facilities, where one is the current home of the IRS with many of the SFO required items already in place.

Section 1.11.A.4 of the SFO indicates that GSA may accept fixtures and/or other tenant improvements already in place. AR at 0075. Equis had advised 210 Earll during the procurement that "the GSA's goal, as it has been communicated to [Equis], was not to completely gut the IRS' space at 210 Earll, but to try to keep as much of the existing infrastructure

as they can … as they understand it is a cost issue and to try to save everyone money." AR at 2507. Notwithstanding the SFO or the guidance provided by Equis, the price evaluation ignores the impact of the existing infrastructure at 210 Earll on the total costs of the government's requirements at both locations.

Section 1.15.D.4.c of the SFO requires that the cost of relocation of furniture and telecommunications be factored into the Government's net present value analysis. AR at 0076. The costs of relocation of furniture and telecommunications are one cost that must be considered without discount. Further, Section 1.15.D.4.b of the SFO indicates that items that will need to be reimbursed in a lump sum payment must also be added to the analysis. *Id.* Neither GSA's price evaluation nor any other reference in the Administrative Record provide a reasonable estimate of these costs. GSA refers to a "standard assumption" of relocation costs of **[REDACTED]** per square foot, or an "above-normal estimate" of relocation costs of **[REDACTED]** per square foot in its protest response, AR at 2346, but neither of these is based on the facts of this case. Further, GSA totally ignored the potential for added lump sum costs. Evidence of the potential lump sum costs was offered by 210 Earll in the GAO Protest. AR at 2559-2560. 210 Earll's estimates amount to $3,999,212.00, which equates to

**[REDACTED]** per BOUSF when applied to 4041 Central's offer. These costs alone, not even including any adjustment for the tenant improvement savings or adjustment discussed above would have a significant change in the ranking of 210 Earll and 4041 Central under the price evaluation, where the difference between the offerors was only **[REDACTED]** per BOUSF.

Further, as set forth in the October 2, 2005 invitation to bid sent only to 210 Earll, GSA requested that 210 Earll provide **[REDACTED]**. This is significant, because GSA's request that 210 Earll provide these items as a base expense created an advantage for 4041 Central, because these same costs would be paid by the Government out of the tenant improvement allowance under 4041 Central's offer. By adding these costs to 210 Earll's rent offer, GSA in effect raised the cost that 210 Earll was required to provide, such that 210 Earll was required to give GSA the same $36.00 tenant improvement allowance as 4041 Central, plus pay for these costs. Because GSA required that 210 Earll alone include in its bid items and costs that exceed the SFO requirements, GSA had an obligation to factor these costs into its price evaluation in order to fairly determine the difference in cost to the Government under the competing proposals. GSA failed to take any of these additional costs into consideration, which clearly prejudiced the evaluation of 210 Earll's rent.

 **REDACTED FOR PUBLIC RELEASE**

"It is a fundamental principle of federal procurement that offerors be treated equally; that is, offerors must be provided with a common basis for preparation of proposals, and award based upon the requirements stated in the solicitation, unless the offerors are notified of changes (or relaxation of) the agency's stated requirements." *ITT Federal Services Corp. v. U.S.*, 45 Fed. Cl. 174, 190 (1999) (citing *For Your Information, Inc.*, B-278352, December 15, 1997, 97-2 CPD ¶ 164). Both CICA and FAR require the agency to evaluate competitive proposals solely on the basis of the factors specified in the solicitation. *See* 41 U.S.C. § 253b (1994); 48 C.F.R. § 15.305(a). These requirements echo the "fundamental principle that the Government 'may not solicit proposals on one basis and make award on another basis.' " *Dubinsky v. United States,* 43 Fed. Cl. 243, 266 (1999). Consequently, this Court may grant an offeror relief if the offeror establishes that the agency evaluated the proposal on a basis different than that announced in the solicitation and that the offeror was prejudiced as a result. *Hydro Eng'g, Inc. v. United States,* 37 Fed. Cl. 448, 471 (1997).

In this case, where 210 Earll is the incumbent lessor, the price evaluation factors in the SFO must be applied fairly to result in a true price comparison to be considered with the "other factors" identified in the SFO

for making the determination of the offer that is most advantageous to the Government. A fair evaluation would reasonably take into consideration the costs to be incurred under the competing proposals as set forth above. However, neither GSA's initial evaluation, nor the subsequent re-evaluation described by the contracting officer accomplishes this. GSA argued to the GAO that any argument that the protester or the awardee has a tenant improvement cost advantage over the other is, at best, pure speculation. However, as demonstrated in the Administrative Record, there is a difference in the costs to be incurred between the two buildings, and several of the costs differences were quantified in 210 Earll's protest exhibits. AR at 2559-2562.

The lack of analysis of the costs to be expended by the government to meet the SFO on the record only showcases once again the fatal flaw in the way that GSA evaluated the offers under this procurement – that there was no attempt to award a lease to the most advantageous offer, price and other factors considered. GSA ignored its obligations under the SFO and simply decided to award the lease to the low bid, ignoring the other factors as argued above, and turning a blind eye to actual increased costs that would be borne by the Government as a result of the move out of 210 Earll. Accordingly, GSA's price evaluation was arbitrary and capricious and

failed to comply with the requirement that the price evaluation reasonably represent the difference in costs to be incurred under competing proposals. *Northrup Grumman et. al.*, B-2955526 et. al., March 16, 2005, 2005 CPD ¶ 45 (unpublished); *Gemmo Impianti SpA,* B-290427, 2002 CPD ¶ 146 at 5-6 (August 9, 2002). In this respect, the flawed price evaluation clearly prejudiced 2120 Earll.

**3. 4041 Central Cannot Comply with the Minimum Requirements of the SFO, as Amended, and, therefore 4041 Central is a Non-conforming Bidder that is not Eligible for Award.**

Finally, the greatest failing by the GSA in this procurement lies in their relaxation of the SFO standards for 4041 Central, resulting in the acceptance of a non-conforming building that fails to meet the minimum requirements of the SFO, as amended. Notwithstanding the errors in evaluation and resulting prejudice to 210 Earll from the GSA's failure to conduct a fair and reasonable evaluation as explained above, the decision to award a lease to 4041 Central was fatally flawed because 4041 Central offered a non-conforming building that fails to meet the minimum standards of the solicitation, as amended. GSA's defense of 4041 Central as an acceptable offeror during the GAO protest proceeding was not and is not supportable on the Administrative Record. 210 Earll should have been

 REDACTED FOR PUBLIC RELEASE

selected for award as the most advantageous acceptable offer submitted to the Government.

In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. *See* 41 U.S.C. § 253b(a) (1994); *see also Marshall-Putnam Soil and Water Conservation Dist.*, B-289949, B-289949.2, May 29, 2002, 2002 CPD ¶ 90 at 5 (under a solicitation for offers for leased office space, a proposal that failed to conform to material solicitation requirements for architectural elevation and landscape plans could not form the basis for award); *Joanell Laboratories et al.*, B-242415.3, May 1, 1991, 91-1 CPD ¶ 424 (protest sustained where record does not show that awardee's offer is technically acceptable in areas alleged by the protester); *Firth Construction Co., Inc. v. United States,* 36 Fed. Cl. 268, 272 (1996) (granting permanent injunction where bids failed conform to the essential requirement of the solicitation and was therefore nonresponsive); *ManTech Advanced Systems International, Inc.*, B-240136, October 26, 1990, 90-2 CPD ¶ 336 (protest that agency relaxed a solicitation requirement is sustained because requirement was mandatory). The clear position of the GAO and this Court in these cases is that an offeror's "price is irrelevant once a proposal is found technically

unacceptable, [and] it cannot be considered for award." *Nevada Automotive Test Center*, B-251137, Mar. 9, 1993, 93-1 CPD ¶ 216; *see also Firth Construction Co., Inc., supra.*

The Administrative Record indicates that GSA sought a prospectus until initial offers were received in this procurement. AR at 1018. The decision to not seek a prospectus appears to have been influenced by the low rent offer from 4041 Central. When Equis learned that the prospectus threshold was lower than the amount used in its initial evaluation, it indicated that there was no problem because the "relocation offer" was well below the prospectus threshold. AR at 1059. Thus, after receipt of offers, the record intimates that GSA was focused on 4041 Central because of the low price. GSA's focus on the price, which was well below the range anticipated by Equis prior to the receipt of bids, AR at 0351, perhaps became the impetus for GSA to ignore 4041 Central's inability to meet certain SFO minimum requirements. Whether driven by the price, or not, GSA relaxed its standards, and accepted a non-conforming bid form 4041 Central in contravention of the SFO and proper procurement practice.

**a. Contiguous Space.**

The concept of contiguous space is a long-standing term of art in defining the federal Government's space requirements. Contiguous is

defined in Black's Law Dictionary 290 (5th ed. 1979) as "...adjoining... touching at a point or along a boundary." "Contiguous" is applied by the Government to define space on a floor as "contiguous space," as well as to define space on more than one floor in a building as "contiguous floors." In *Mainmark Associates, Ltd.*, B-222454, 86-2 CPD 31 (July 3, 1986), the GAO denied a protest against the requirement for space to be on contiguous floors. In *Mainmark Associates*, the GSA noted that "contiguous space restrictions are not new ... and have been imposed because the use of less restrictive arrangements tends to make staff supervision and informal meetings more difficult." In addition, "GSA reported that security would be diminished without the restriction because it would be more difficult to control access to [more] floors." *Id.*

In this case, Section 1.1A.1 of the SFO, AR at 0070, specifically provides that the "offered space must be contiguous except where noted elsewhere in this solicitation." This requirement followed the record of SFO development, which mentions the need for contiguous space, AR at 0051, and the published Presolicitation Notice, which indicates that the government was seeking "contiguous and related space." AR at 0053.

GSA contended in the agency report submitted in the GAO Protest that 210 Earll has interpreted this requirement of the solicitation incorrectly.

GSA's argument, however, is inconsistent with the Administrative Record, is not supported by the SFO, as amended, and is contrary to every explanation of the requirement previously provided to 210 Earll by GSA's representatives.

Section 10.2.1 of the Special Requirements, Attachment #1 to the SFO, AR at 0184, did permit that Taxpayer Assistance Center be located on the "ground floor,"1 and that the remaining space could be separated from the Taxpayer Assistance Center by being on the third floor or above. The SFO also permitted that the mail room be non-contiguous with the rest of the space. AR at 0070. However, these are the only permitted exceptions to the requirement for "contiguous space" that is "noted

---

1. Section 1.1 of the SFO requires that the space be contiguous, except as noted, and makes no reference to permitting multiple buildings as meeting the space requirements. Specifically, Section 1.1B requires that the space be in a quality **building** (emphasis added). The only exception to the requirement for contiguous space is that the Taxpayer Assistance Center be located on the "ground floor." 4041 Central has offered space in two (2) separate buildings. There is no connection between these buildings, and the taxpayer Assistance Center is not located in the ground floor of the building housing the balance of IRS' space requirements. Nothing in the SFO, the Special Requirements, nor in the record supports the contention that the Taxpayer Assistance Center could be separated from the rest of the space being in a separate building. In this regard, GSA has accepted non-conforming space by ignoring the requirement that the Taxpayer Assistance Center be located on the ground floor of the building that is to house the balance of the government's space.

elsewhere in the solicitation," as permitted under SFO Section 1.1A.1. AR at 0070.

Further, SFO Amendment No. 1, AR at 0362-0373, deleted the subparagraph of the Section 10.2.1 of the Special Requirements that indicated the balance of the space must be on the third level or above, but the amendment did not change the requirement in SFO 1.1A.1 that the space be contiguous except as noted, nor did it note that the space above the Taxpayer Assistance Center be non-contiguous. In fact, there is no reference in the SFO that permits the space above the Taxpayer Assistance Center to be on non-contiguous floors.

In the GAO Protest, GSA argued that the interpretation of contiguous as "connected without separation" is more restrictive than the program needs of the IRS. AR at 2333. GSA cited to dictionary references for the proposition that contiguous can also mean "near without connection." AR at 2334. GSA rationalized that this definition is reasonable because the efficiency of space utilization is not going to be affected by a lack of touching between floors. GSA's argument, however, was directly contrary to the instruction provided by its representatives to 210 Earll during discussions. GSA consistently advised 210 Earll throughout the

procurement process that contiguous meant touching.2 This definition was stressed from the functionality and security related aspects of the space. From the security perspective alone, it makes no sense that GSA would request Level IV security on the one hand, and then permit the space to be broken up into three non-contiguous blocks that would expose Government employees to security risks as well as increase the costs of providing security at multiple locations.

The GAO has held that where a protester and agency disagree over the meaning of solicitation language, the GAO will resolve the matter by reading the solicitation as a whole and in a manner that gives effect to all its provisions. *Pro Constr., Inc.*, B-272458, Oct. 10, 1996, 96-2 CPD ¶ 141 at 3; *Lithos Restoration, Ltd.*, B-247003.2, Apr. 22, 1992, 92-1 CPD ¶ 379 at 4. To be reasonable, and therefore valid, an interpretation must be consistent with the solicitation when read as a whole and in a reasonable manner. *Allied Technology Group, Inc. v. United States,* 39 Fed. Cl. 125, 138 (1997). Applied to this case, the specific reference to contiguous space, as explained by GSA's own representatives and the noted importance of security as set forth in numerous SFO references (notably

2. GSA rejected the layout of the Taxpayer Assistance Center proffered by 210 Earll because it called for two blocks of space separated by a hallway. AR at 1088. This confirms GSA's announced interpretation of "contiguous" as touching, not just near to as alleged in the GAO Protest.

the five pages comprising Section 1.2.3 of the Special Requirements), it is inconsistent to believe that the solicitation did not require contiguous floors above the Taxpayer Assistance Center. Accordingly, GSA's interpretation is not reasonable based on a reading of the solicitation as a whole. Therefore, the fact that 4041 Central's offer included non-contiguous space means that 4041 Central failed to meet a key minimum requirement of the SFO, and is therefore unacceptable.

**b. Secured Parking**

Section 1.3.B.4 of the SFO set forth specific requirements for secure parking. AR at 0071. 4041 Central offered a large public parking facility serving the non-government tenants of the building as well as the general public. In the GAO Protest, GSA defended the allegation that 4041 Central has a large public parking facility that cannot provide separate and secure parking required by the SFO by arguing that the awardee's offer did not take any exception to this requirement and must be read as including a commitment to meeting this requirement. AR at 2334. The Administrative Record is devoid of any attempt by GSA to confirm, however, that the garage at 4041 Central can meet the SFO requirements. GSA argued only that it sees no reason to suspect the awardee's ability or commitment to meet this requirement. But, the record does not refute the allegation that

 REDACTED FOR PUBLIC RELEASE

the facility offered by 4041 Central is incapable of providing the secured parking requirements of the SFO.

Based on the basic terms of the SFO and the uncontroverted facts of this case, GSA was required to determine that the garage could comply with the SFO or include the cost of such compliance in the award evaluation as demonstrated above. 4041 Central added in the GAO Protest that GSA could pay for alterations to the garage if necessary to meet the SFO requirements for secure parking. AR at 2457. Because GSA did no due diligence on this issue, however, it never established the requisite answer to "whether" or "at what cost" this mandatory requirement of the SFO could be met. Since secure parking was a clear and mandatory requirement of the SFO, 210 Earll maintains that 4041 Central cannot meet the necessary requirements and, therefore, did not submit an acceptable offer under the SFO.

**c. Level IV Security Standards.**

The SFO, Section 1.4, mandated that the IRS facility would have to meet Level IV Security Standards. AR at 0071. These standards were spelled out in the Special Requirements attachment to the SFO. AR at 0186-0190. On or about October 26, 2005, the IRS published notes of the pre-proposal conference, and indicated that the office requirement will be

addressed as Level 4 security, because they did "not want to underestimate security as has previously happened in past projects." AR at 0351. Despite this admonition, a GSA security specialist reviewed the SFO and warned that the SFO terms seemed "a little loose." AR at 1463.

In any case, there is no evidence in the Administrative Record that defeats 210 Earll's allegation that 4041 Central cannot meet the specific Level IV security requirements in the SFO, or in the alternative, or at what cost they can be met. The contracting officer refers to an informal conversation with an unnamed individual concerning "security threat levels for both buildings," in the Statement of Relevant Facts, AR at 2348, but such informal comments fail to rise to the level of proof necessary to demonstrate compliance with a mission critical requirement like Level IV security. Quite frankly, the cavalier treatment of Level IV security in the award decision is alarming. The best GSA can offer on the record is the statement by Equis that "since most of these costs are to be TI costs, they should not have much impact on the offers." AR at 1462. But nowhere in the record is there any analysis of compliance with the SFO.

4041 Central is a twenty story, multi-tenanted facility with no fencing, no set-backs, and no Level IV security infrastructure in place. AR at 1743-1800. Additionally, 4041 Central has leased 54,800 square feet for a

school that will have up to 500 students attending class at that location. AR at 2526-2527. In fact, as noted by Mr. Lendrum, the architect of record for 4041 Central, the building at 4041 Central is not a good candidate to meet the security requirements of the SFO for various obvious reasons. AR at 2493-2595. These facts should have raised an alarm, but no one at GSA even noticed.

For example, one of the key elements of the Level IV security is the requirement for only one (1) public entry point to the building, such that the Government can control and screen entrants to the building per Section 1.2.3.A of the Special Requirements. AR at 0184. To the contrary, Mr. Lendrum notes that there are no less than EIGHT (8) access (ingress and egress) doors to the complex, none of which has controlled access as they all serve multiple tenants and visitors. AR at 2493. The existence of multiple points of ingress and egress, multiple tenants including a public school, and the separation of the government's premises in three (3) non-contiguous blocks of space renders the possibility of meeting Level IV security standards at 4041 Central at least very expensive if possible at all. Compared to 210 Earll, in which the IRS would be the sole or predominant occupant and could control access to its space at all times, 4041 Central had serious problems to overcome to meet the SFO. Accordingly, GSA's

failure to address 4041 Central's compliance with Level IV security in its award decision was clearly arbitrary and capricious and thoroughly prejudicial to 210 Earll.

**d. Seismic Standards.**

Section 2.2 of the SFO, AR at 0079, Seismic Safety for Existing Construction, is clear:

> B. The Government intends to award a lease to an offeror of a building that meets the Seismic Standards. If an offer is received which meets the Seismic Standards and the other requirements of this solicitation, then other offers which do not meet the Seismic Standards will not be considered (emphasis added).

"Seismic Standards" as referred to in Section 2.2 means the Life Safety Performance Level of RP 6, unless otherwise specified. AR at 0079. These standards are set forth in publications issued by the National Institutes of Science and Technology as referenced in the SFO. AR at 2529-2555.

The Administrative Record reveals that 4041 Central did not submit any seismic certificate until December 15, 2005, AR at 1488, and GSA determined on December 23, 2005, that this seismic certificate was "unacceptable." AR at 1554. After best and final offers, GSA engaged in discussions with 4041 Central about this certificate, and additional documents were requested by GSA to be submitted within 60 days of

 REDACTED FOR PUBLIC RELEASE

award. AR at 2004. In fact, GSA indicated to 4041 Central that the awarded lease was made "conditional" on GSA receiving the documents necessary to support the seismic certificate. AR at 1965. On February 23, 2006, again after best and final offers and after award, GSA determined that 4041 Central's revised certificate and FEMA checklists "appear[ed] to be correct and complete, and therefore, deemed acceptable…" AR at 2267.

GSA engaged in post-BAFO discussions with 4041 Central in an attempt to correct its bid to meet the seismic standard. Further, as stated in Section 2.2 of the SFO, because 210 Earll did meet the seismic standard, the GSA should not have considered 4041 Central if at BAFO it was determined not to meet the seismic standard.

210 Earll submitted its offer in accordance with the SFO, and was required to include the cost of meeting the standards in its price. As revealed above, 4041 Central was treated differently by GSA, and was given a chance after BAFO to provide evidence that it was a Benchmark Building exempting it from compliance with the Standards. GSA's actions clearly are not permitted by the SFO, law or regulation, and as a result, the award to 4041 Central cannot be validated. Of course, these actions

 REDACTED FOR PUBLIC RELEASE

clearly prejudiced 210 Earll, as the most advantageous offeror, price and other factors considered, that had submitted a technically acceptable offer.

**e. Additional Non-conforming Items.**

In addition to the requirements discussed in detail above, 210 Earll has also alleged that 4041 Central cannot meet other minimum requirements of the SFO. GSA's defense with regard to these items in the GAO Protest has been that GSA has no reason to believe 4041 Central cannot meet the requirements of the SFO and the offeror has committed to meeting this requirement by executing the SFO and lease. However, it is clear in the Administrative Record that 4041 Central has not affirmatively indicated that it can or will meet certain of the listed SFO minimum requirements.

4041 Central overtly changed the minimum live load capacity requirement in SFO Section 4.10 from 80 to 70 pounds. AR at 0893. In discussing this change 4041 Central indicated that it was a "super critical deal killer point." AR at 1112. However, despite the existence of this information, there is no evidence in the Administrative that GSA verified that 4041 Central could meet the 80 pound requirement.

The Administrative Record also contains evidence of other deficiencies at 4041 Central. **[REDACTED]** AR at 0986, calls into question

whether 4041 Central can meet the requirements of Section 6.17. Further, the fact that the **[REDACTED]** AR at 0988, caused 4041 Central itself to opine in writing the concern that the building could not meet the requirements of SFO Section 4.16. AR at 1112. Specifically, SFO Section 4.16 required that the building encompass the characteristics of a "smart building." AR at 0087.

Despite the existence of the above-referenced information on 4041 Central's offer, GSA failed to proceed with any due diligence to verify that 4041 Central can meet the current GSA building minimum requirements as set forth in the SFO. The lack of follow-up by GSA on these issues certainly appears to demonstrate that GSA looked the other way, and did not require affirmative proof that 4041 Central could and/or would meet the SFO requirements. As noted in the document included in the Administrative Record from Mr. Lendrum, the architect for both buildings, 210 Earll was designed and constructed to meet the specific requirements of the federal Government while 4041 Central was not. AR at 2493-2495.

Clearly, GSA relaxed its standards and accepted a non-conforming building in order to capitalize on the low price offered by 4041 Central. GSA did no due diligence and did not question 4041 Central on meeting these SFO standards, even in the face of non-conforming statements and

evidence n the record. In fact, GSA even helped 4041 Central after BAFO so that their building could be considered "exempt" with regard to the Seismic Standards. GSA's acceptance of these deviations is directly prejudicial to 210 Earll, which meets each and every requirement of the SFO, without deviation. The acceptance by GSA of such deviations in part explains why the offered price by 4041 Central could be lower than 210 Earll; *i.e.* GSA accepted space that was lower in quality than specified in the SFO. Accordingly, the acceptance of these deviations was not permitted by the SFO, and cannot be permitted in a valid lease award.

Accordingly, GSA's decision to award the lease to 4041 Central was therefore irrational, and agency's conduct was arbitrary, capricious and contrary to procurement law.

**4. The Award Letter is Not a Valid, Enforceable Contract**

The terms of the solicitation and precedent from this Court support 210 Earll's position that GSA's issuance of the award letter does not establish a valid contract between 4041 Central and the Government under the relevant circumstances. Section 1.17 of the SFO establishes a distinction between a signed lease and mere acceptance of an offer. AR at 0076. Subparagraph A of Section 1.17 indicates that "after conclusion of negotiations, the Contracting Officer will require the Offeror selected for

award to execute the proposed lease prepared by GSA which reflects the proposed agreement of the parties. *Id.* Thus, execution of a lease is the action that evidences the final agreement between the parties, and the SFO mandates that an executed lease is required to complete an award under the solicitation. Without a signed lease, the parties will not have completed negotiations, and any award letter will not contain the complete and final agreement of the parties.

Significantly, the SFO clarifies that a lease is necessary even if there is an award letter. Subparagraph C of Section 1.17 states that "the acceptance of the offer and award of the lease by the Government occurs upon notification of unconditional acceptance of the offer or execution of the lease by the Contracting Officer...". *Id.* The subtle distinction here is that "award" of a lease may be evidenced by unconditional acceptance of the offer or execution of the lease, but a "lease" cannot exist without execution of a lease agreement by both parties. The Government may indicate its intention to award a lease through an award letter, but, until a lease is actually signed by the Government, the award is subject to termination and/or rescission because the parties have not reflected their agreement in a lease. This is true even where the proposed lease does not contain a termination for convenience clause.

This reasoning is supported by this Court's precedents. The Court held in *Sterling-Kates v. United States*, 12 Cl. Ct. 290, 34 Cont. Cas. Fed. (CCH) ¶75,286 (1987), that the existence of an award letter is not evidence of a valid contract in a negotiated lease procurement. In *Sterling-Kates*, the Court reviewed a claim by GSA that a valid contract came into being when it issued its acceptance of an offer to construct a building for the lease of the Government at the time an award letter was issued, even though no lease was ever executed by the parties.3 The Court concluded that no valid contract was formed by the award letter. *Id.* at 305. In fact, the Court held that GSA's argument that "a contract had been awarded when [the] offer had been accepted [in an award letter] would have true meaning only in the context of an advertised competitive procurement." *Id.* The Court determined that the award letter was merely another step in the negotiations. *Id.* The negotiations were not deemed to be "completed" until there was a signed lease. *Id.* Specifically, the Court stated:

> "A contract is formed at the conclusion of the negotiations when the parties have reached a meeting of the minds. (Frequently, the Government advises the contractor of this event by forwarding a

---

3. The solicitation in the GSA procurement reviewed by the Court in *Sterling-Kates,* contained the same language as the instant SFO, i.e. that "unconditional acceptance of an offer ... establishes a valid contract." The existence of this language, as explained by the Court, did not overcome the fact that a valid contract could not be formed in the absence of a signed lease that represented the final agreement of the parties.

> document reducing all agreements to writing. When the contractor executes this document, and returns it to the Government, it submits its final proposal or "offer." Execution by the Government then constitutes the Government's "acceptance" of the proposal."
>
> *Id.* at p. 304.

Although the Government issued an award letter to 4041 Central, the parties have not taken the final and essential step of actually executing a lease. The essential step in this case is the execution of a lease by the parties, because it is the lease, not the award letter that represents the final agreement of the parties. The award letter is not the intended result of the procurement, and therefore, is not a valid and binding contract. The fact that an executed lease is required for a valid contract is also explained by the Court in *Essen Mall Properties v. United States*, 21 Ct. Cl. 430 (1990).

The award letter indicates that GSA intends to accept 4041 Central's offer, and cites several economic terms of the offer. AR at 2000. The award letter does not include each and every term of the lease, however, certain conditions related to the seismic certificate are contained in the lease but not in the award letter. Also, the January 30, 2006 award letter states the following: "GSA will not recognize changes to the Lease Agreement unless authorized in writing by the Contracting Officer." AR at 2661. The mere fact that GSA includes the possibility for future changes to the lease agreement defeats the argument that it was a final agreement of

the parties. Further, there is a January 27, 2006 letter from Equis Corporation that included the lease packages for 4041 Central's review and signature. AR at 2662. The January 27, 2006 letter indicates that after GSA "reviews" the signed lease, it will sign the lease and return a signed copy to 4041 Central. The fact that the lease had yet to be reviewed indicates that the proposed lease was not final. In any case, the letters are clear indications that the parties intended the signed lease to be the contract, rather than either of the letters submitted to 4041 Central by GSA or Equis Corporation.

Of great significance regarding this issue, is the fact that 4041 Central's final offer itself was conditioned. 4041 Central's offer included the condition that GSA was "ultimately responsible to independently verify the suitability of the premises for occupancy." AR at 1619. However, as noted above, GSA performed no due diligence to verify the compliance of 4041 Central to the SFO. Accordingly, GSA's acceptance of 4041 Central's offer was subject to an express condition in the offer.

The lease is the contract upon which the parties establish the terms of their agreement, and establish reliance on the performance of the other party in meeting its covenants and obligations. The award letter in this case, dated January 30, 2006, fails to convey the same status as a signed

lease. Importantly, the award letter is not an unconditional acceptance of 4041 Central's offer establishing all of the terms of the lease; it is expressly conditioned on at least the execution of a lease. And the lease itself was conditioned upon final receipt and approval of the seismic certificate, which was not yet accepted by GSA at the time the lease or the letters were delivered to 4041 Central. The Government's letters open the door for further negotiations and additional terms and conditions to be included in the actual lease which are not part of the award letter. For all of these reasons, as noted in the Court's decision in *Sterling-Kates*, the award letter is not a valid and binding lease agreement. Therefore, the award may be terminated and/or rescinded by this Court.

### 5. 210 Earll is Entitled to Receive the Lease Award

Courts have consistently held that award of a contract to the next lowest responsive bidder is an available remedy to a protester once an initial award has been held to be improper. *See, e.g., Buffalo Cent. Terminal v. U.S.*, 886 F.Supp. 1031, 1042-1043 (W.D. N.Y. 1995)(stating that "one available remedy would be to award the contract to the next, lowest responsive bidder); *Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 204 (D.C. Cir. 1984); *Ulstein Maritime, Ltd. v. United States,* 833 F.2d 1052, 1055 (1st Cir. 1987) (Davis, J., then of the Federal Circuit, sitting by

 REDACTED FOR PUBLIC RELEASE

designation) (affirming district court's order requiring Navy to award contract to next lowest, responsive and responsible bidder); *Action Service Corp. v. Garrett,* 790 F.Supp. 1188, 1197 (D. Puerto Rico 1992); *reconsideration denied,* 797 F.Supp. 82, 85 (D. Puerto Rico 1992)(ordered the withdraw of contract and awarded contract to next lowest responsible and responsive bidder). When a court directs an agency to award a contract to the next lowest responsive bidder, the court is "simply undoing the illegal actions of the agency, and instructing the agency to proceed with the procurement process." *Ulstein Maritime, Ltd.,* 833 F.2d at 1058.

A court may order that a contract be awarded to a specific party when "it is clear that, but for the illegal behavior of the agency, the contract would have been awarded to the party asking the court to order the award." *Action Service Corp. v. Garrett,* 797 F.Supp. at 85; *Ulstein Maritime, Ltd.,* 833 F.2d at 1058. As demonstrated above, the Agency's award of the Lease to 4041 Central was arbitrary, capricious and contrary to procurement law as 4041 Central's bid did not conform to the requirements of the SFO. It is also demonstrated above that 210 Earll is a responsible bidder who submitted an offer that fully complies with the SFO without deviation. Further, as the incumbent lessor for the IRS, 210 Earll is currently providing the space requirements of the IRS, and there would be

no disruption to the agency if the award to 4041 Central is rescinded and a lease granted to 210 Earll. It is clear that but for the illegal and unreasonable award to 4041 Central, 210 Earll would have received the award under the SFO as the next-in-line bidder. Therefore, 210 Earll should receive award of the lease.

### D. 210 Earll Will Suffer Irreparable Harm if the Lease is Signed and Performed.

210 Earll will suffer irreparable harm if an injunction is not issued and the Court allows GSA to execute and perform under the lease. When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." *Seattle Sec. Services, Inc. v. U.S,*. 45 Fed. Cl. 560, 571 (Fed. Cl. 2000)(citations omitted). 210 Earll lacks an adequate remedy at law as without the requested injunction, GSA plans on moving the IRS out of 210 Earll, and 210 Earll cannot receive the value of the loss of the IRS through the bid preparation and protest costs already awarded by the GAO. Bid preparation cost sand protest costs are not a fair and equitable alternative to award of the subject lease. *See Bean Dredging Corp. v. U.S.*, 22 Cl. Ct. 519, 524 (1991) (bidder would be irreparably harmed because it could recover only bid preparation costs).

 REDACTED FOR PUBLIC RELEASE

Additionally, a lost opportunity to compete on a level playing field for a contract is sufficient to prove irreparable harm. *See United Int'l Investigative Servs., Inc. v. United States,* 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm."). Support also exists for the notion that the denial of the right to have its bid fairly and lawfully considered constitutes irreparable injury. *Ellsworth Associates, Inc. v. U.S.* 45 Fed. Cl. 388, 398 (Fed. Cl. 1999)(citations omitted).

Accordingly, 210 Earll will suffer irreparable injury if the injunctive relief is denied.

### E. The Balance of Hardships Tips in the Plaintiff's Favor.

Under this factor, the Court must consider whether the balance of hardships leans in the 210 Earll's favor. *Seattle Sec. Services, Inc.*, 45 Fed. Cl. at 572. This requires a consideration of the harm to 210 Earll if an injunction is not granted and the harm to the Government and to 4041 Central if an injunction is granted. As the incumbent lessor who modified its building to meet the requirements of the IRS and currently receives the revenue of the IRS lease, 210 Earll will certainly experience hardship if it is not awarded the lease and the IRS vacates 210 Earll's building. The loss

of the IRS as a tenant cannot be adequately remedied, except by award of the lease.

The only harm that 4041 Central can claim it will incur as a result of this Court issuing an injunction preventing GSA from executing the lease and awarding the lease to 210 Earll is a limited window of lost opportunity to lease the space offered to IRS to other tenants. 4041 Central has alleged that it made certain financial obligations based on the anticipation of receiving the IRS lease, but these obligations may still be recouped by re-leasing the premises to other tenants. Unlike 210 Earll, 4041 Central can re-lease the space over the remaining period of the IRS lease and obtain a new tenant with no lost revenue, since the IRS would not have fully occupied 4041 Central until September 2007 anyway. In this regard, the harm to 4041 Central is far less disastrous than the loss of the IRS tenant to 210 Earll.

This factor is for this reason dominated by the success factor, and therefore favors 210 Earll. *University Research Co., LLC v. U.S.*, 65 Fed. Cl. 500, 514 (2005). Also, "an incumbent is likely to suffer potentially greater injury than a new bidder for a contract, based on the difference between the actual and the prospective: an incumbent's bid is based on keeping together a team whose existence is eliminated in the absence of

injunctive relief, while a new bidder is usually projecting the sort of team it could assemble if awarded the contract." *Id.* Accordingly, the hardships tip in favor of the incumbent lessor, 210 Earll.

Additionally, the Government's harm is minimized by this Court's awarding the lease to the bidder who meets all of the Government's requirements, 210 Earll.

### F. A Permanent Injunction is in the Public Interest

A permanent injunction which: (1) enjoins the GSA from signing the lease; and (2) corrects the illegal action of GSA and awards the lease to the next lowest responsive bidder, Plaintiff 210 Earll, will serve the public interest.

Federal courts have repeatedly recognized that the public has an overriding interest in preserving the integrity of the procurement process by requiring the Government to follow its procurement laws and regulations. *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994); *see also Seattle Security v. United States*, 45 Fed. Cl. at 572.

In addition, the public interest would not be served by having the IRS located in a building, such as 4041 Central's, which does not conform to the IRS' requirements.

Accordingly, the public interest is served by this Court enjoining the GSA from executing the lease and making award to 210 Earll. The Court should therefore grant 210 Earll's request for a permanent injunction and declaratory relief.

## IV. Conclusion

210 Earll has: (1) made a showing that GSA's award to 4041 Central is arbitrary and capricious, an abuse of discretion, and violates procurement law; (2) demonstrated that the balance of harms weighs decidedly in 210 Earll's favor, and (3) established that the granting of a permanent injunction serves the public interest. The facts are clear in this case that GSA unfairly prejudiced 210 Earll by selecting 4041 Central for award. GSA's actions are not supported by the Administrative Record and, demonstrate that the proper remedy is award of the lease to 210 Earll. The Court, accordingly, should grant 210 Earll's Motion for Judgment on the Administrative Record and direct GSA not to execute the lease, declare 4041 Central's bid to be nonconforming, and award the lease to the lowest priced responsive bidder, 210 Earll.

Dated: June 20, 2006

Respectfully submitted,

s/ Edward V. Gregorowicz, Jr.
Edward V. Gregorowicz, Jr.

The Law Offices of Edward V.
Gregorowicz, Jr.
10565 Lee Highway, Suite 102
Fairfax, Virginia 22030
Phone: (703) 934-6645
Fax: (703) 934-6649
*Counsel for Plaintiff 210 Earll, L.L.C.*

 **REDACTED FOR PUBLIC RELEASE**

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2006 a copy of the foregoing "REDACTED MEMORANDUM IN SUPPORT OF PLAINTIFF 210 EARLL'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Edward V. Gregorowicz, Jr.
Edward V. Gregorowicz, Jr.