# In the United States Court of Federal Claims

Case No. 06-360C
(**Filed Under Seal:** November 16, 2006)
(Reissued November 21, 2006 – FOR PUBLICATION)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |
| **210 EARLL, L.L.C.,** | * | Post-Award Bid Protest; |
| *Plaintiff,* | * | Interested Party; Public Buildings |
| | * | Act, 40 U.S.C. § 3301 et seq.; |
| v. | * | Prospectus Threshold; Judgment |
| | * | on the Administrative Record; |
| **THE UNITED STATES OF AMERICA,** | * | Agency Discretion; Rational |
| *Defendant* | * | Basis; Agency's Lack of |
| | * | Contemporaneous |
| and | * | Documentation of Decision; |
| | * | Requirements of Unsworn |
| **4041 CENTRAL PLAZA, L.L.C.,** | * | Declaration; Agency Failure to |
| *Intervenor.* | * | Follow Solicitation for Offers. |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * | * | |

    ***Edward V. Gregorowicz, Jr.***, The Law Offices of Edward V. Gregorowicz, Fairfax, VA, Counsel of Record for Plaintiff.

    ***Steven Mager***, Commercial Litigation Branch, Department of Justice, Washington, D.C., Counsel of Record for the Defendant.  With him on the briefs were ***David M. Cohen***, Director, ***Franklin E. White, Jr.***, Assistant Director, and ***Peter D. Keisler***, Assistant Attorney General.

    ***Richard L. Moorhouse***, Greenberg Traurig, LLP, McLean, VA, Counsel of Record for the Intervenor.

    ***Stephanie Wilson***, law clerk.

## <u>OPINION</u>

**<u>BASKIR</u>, Judge.**

    In 2005, the U.S. General Services Administration ("GSA") issued a Solicitation for Offers ("SFO") seeking bids from commercial landlords to lease office and related rental space in Phoenix, Arizona, to the U.S. Internal Revenue Service ("IRS").  The

GSA received three offers, including Plaintiff 210 Earll, L.L.C. ("210 Earll") and Intervenor 4041 Central Plaza, L.L.C. ("4041 Central"). 210 Earll filed this bid protest challenging GSA's selection of 4041 Central's offer for award on a number of grounds. The Government has filed a motion to dismiss for lack of standing, and all three parties have filed cross-motions for judgment upon the administrative record.

Neither the terms of the SFO nor the Public Buildings Act, 40 U.S.C. § 3301 *et seq.*, render 210 Earll ineligible for award.  Because we conclude that 210 Earll is an interested party that would have had a substantial chance to receive the award but for the alleged procurement errors, **we deny the Defendant's Motion to Dismiss.**

We find that the GSA committed reversible error when it completely failed to consider the non-price factors, as required under the SFO, in its analysis of the offers. Furthermore, the Government erred in failing to factor relocation costs into 4041 Central's offer, and in making a Prospectus Threshold comparison using an average of net rent over the full twenty years rather than the firm term of ten years.  On these issues, **we grant in part Plaintiff's Motion and deny in part Defendant's and Intervenor's Cross-Motions for Judgment on the Administrative Record.**

The SFO did not explicitly dictate how GSA was to conduct its cost analysis, and therefore it was within the Contracting Officer's discretion how to evaluate the lump sum costs to be borne by the Government in its analysis. We also conclude that the GSA was not arbitrary and capricious in determining that 4041 Central was a conforming bidder eligible for award.  Therefore, on these issues, **we grant in part Defendant's and Intervenor's Cross-Motions and deny in part Plaintiff's Motion for Judgment on the Administrative Record.**

## Background

I.      GSA's Solicitation for Offers

In early 2005, GSA began the procurement of a follow-on lease for office and related space for the IRS in Phoenix, Arizona. The GSA solicited offers from six firms in October 2005.  On October 2, 2005, the GSA distributed the SFO, dated September 27, 2005.  Offerors were required to submit their offers in standard GSA SFO format, which included submitting a Seismic Certificate, plans of the offered space, and other supporting evidence of capability to perform.  Administrative Record ("AR") 0072.  GSA was represented by a broker, Equis, during the procurement.

Plaintiff 210 Earll is the incumbent on this lease.  The current lease between GSA and 210 Earll is set to expire by its terms on September 17, 2007.

2

A.     Award Factors and Contract Formation

The SFO stated that GSA would consider both price and other award factors in determining which bidder's offer was most advantageous to the Government.  AR 0079. The "Award Factors" set forth in the SFO included "Accessibility," "Seismic Safety for Existing Construction," and "Other Factors."  AR 0078-79.  The "Other Factors" included:

1.     Quality of Space
2.     Past Performance of Offeror and other Key Personnel (i.e. architect, engineer, lead designer, etc.) on Comparable Projects
3.     Past Performance of Offeror in Managing and Operating Comparable Facilities

AR 0079.  The SFO did not define "Quality of Space," nor did it dictate how the Contracting Officer was to analyze or evaluate these "Other Factors," or what weight they were to be given.

The GSA indicated in a pre-proposal conference that the rent for years 1 to 10 had to be flat, but that the offerors were permitted to offer a reasonable stepped up rent for years 11 to 20 to account for the fact that the lease did not provide for Operating Cost Escalations or Tax Adjustments.  AR 0349.  Notes from an IRS/GSA/Equis meeting indicated that Equis believed that the "rental rate will be $36-$39 sf."  AR 0351.

The SFO describes the award and creation of a contract as follows:

The acceptance of the offer and award of the lease by the Government occurs upon notification of unconditional acceptance of the offer or execution of the lease by the Contracting Office and mailing or otherwise furnishing written notification or the executed lease to the successful Offeror.

AR 0076.  The GSA Form 3516A, which was attached to the SFO, also stated that "the unconditional written acceptance of an offer establishes a valid contract."  AR 0139. Whether a contract was created upon acceptance of 4041 Central's offer was an issue during the later proceedings before the GAO, and before us.

B.     Contiguous Space Requirements

The GSA published a Presolicitation Notice on August 15, 2005.  The Notice stated that "[i]n addition to the contiguous space, some additional space and mail room space will be required on the first or ground floor."  AR 0053.  The SFO Amendment #1 included the following requirements for the offered space:

1.1(A)       The General Services Administration (GSA) is interested in leasing approximately <u>108,641</u> rentable square feet of space.  The rentable space shall yield a minimum of <u>97,467</u> ANSI/BOMA Office Area (previously Usable) square feet to a maximum of <u>101,399</u> ANSI/BOMA Office Area square feet, available for use by tenant for personnel, furnishings, and equipment.

1.1(A)(2)    Offered space must include approximately 8,600 USF of contiguous space for a Taxpayer Assistance Center.  The Government [prefers] for this space to be located on the first floor.

AR 0362.

The SFO set forth "stacking considerations" that described the design requirements for the IRS facility.  This section states that the Taxpayer Assistance Center, the Mail Room, and the Interview Rooms must be located on the ground/first floor level.  The remaining components are listed as being located on the third floor or above.  If the IRS is not the sole tenant of the building, certain security devices were required.  AR 0184-85.

At a pre-proposal conference, the GSA responded to a question about the contiguous space requirement as follows:

The Government will consider spaces that are non-contiguous as part of this project.  The SFO and Special Requirements specify which spaces must be one contiguous space and that some spaces must be located on the first floor.  The other required space does not need to be contiguous to these spaces.  Additionally, the Government will accept offers if the large block of space is not contiguous as long as it is not the compilation of a large number of separate blocks of space[.]

AR 0349.

C.    <u>Tenant Improvements</u>

The GSA anticipated that it would lease a building shell with a Tenant Improvement ("TI") Allowance.  The SFO stated:

It is the intent of the Government to lease a building shell with a Tenant Improvement Allowance.  All improvements in the base building, lobbies, common areas, and core areas shall be provided by the Lessor, at the Lessor's expense.

4

AR 0073.  With respect to Tenant Improvements, the SFO required that

> [a]ll Tenant Improvements required by the Government for occupancy shall be performed by the successful Offeror as part of the rental consideration, and all improvements shall meet the quality standards and requirements of this SFO and GSA Form 3517, General Clauses.

AR 0074.  The SFO stated that all Tenant Improvements would be identified after the award of the contract and that "[t]he Government, at its sole discretion, shall make all decisions as to the usage of the Tenant Improvement Allowance." *Id.*

In its October 2, 2005 cover letter sent to 210 Earll, the GSA stated that as part of the new lease, 210 Earll was responsible for addressing six additional items beyond the SFO "at their own expense."  The cover letter to 210 Earll stated:

1. Please provide a proposed plan of how you intend to complete construction related activities in the IRS occupied space with minimal disruption to IRS's daily activities.  This plan needs to demonstrate and incorporate items such as power, telephone and data cabling, furniture, etc.
2. Provide new paint and carpet throughout the IRS occupied space. This must be completed in conjunction with the required Tenant Improvements and also applies to those spaces receiving no improvements as part of the new lease.  Work must be completed after normal working hours as to not disrupt business activities of the Government.  This will include the relocation of all furniture and fixtures required to effectively complete the work.
3. Provide new paint to the exterior of the building.
4. Adjust or replace the existing HVAC system to ensure it meets the current Government requirements.
5. Repair or replace the leaky faucets in the restrooms.
6. Provide additional ventilation for the restrooms.

AR 0327.  210 Earll claims that this requirement was prejudicial to it and created an advantage for 4041 Central, because these costs would have been paid for by the Government out of the TI Allowance under 4041 Central's offer.

210 Earll's broker sent a letter to Equis that suggested that providing new paint and carpet "might adversely affect [210 Earll's] offer since this is not a requirement for alternative locations."  AR 0382.  Equis responded:

> The tenant improvement allowance of $36.00 per Office Area square foot will be used in evaluating all offers received.  Since painting and carpeting is a tenant improvement, the cost will be a portion of the tenant improvement allowance.  The offeror may offer a credit to be used against

this allowance.  The credit will reduce the $36.00 tenant allowance used in the evaluation of the offers.  It is not the intent of the contacting [sic] officer per Section 5.18 Paragraph D.2 to permit the use of existing carpet at any location.

*Id.*

D.    Seismic Safety Requirement

The Offerors were required to submit a Seismic Certificate as part of their offers. With respect to the Seismic Safety requirement, the SFO stated:

The Government intends to award a lease to an Offeror of a building that meets the Seismic Standards.  If an offer is received which meets the Seismic Standards and the other requirements of this solicitation, then other offers which do not meet the Seismic Standards will not be considered.  If none of the offers meets the Seismic Standards, the Contracting Officer will make the award to the Offeror whose building meets the other requirements of this solicitation and provides the best value to the Government, taking into account price, seismic safety and any other award factors specified in this solicitation.

AR 0079.  The SFO went on to state:

The Contracting Officer may, at his/her discretion, allow an Offeror to submit a Seismic Certificate after the deadline for best and final offers. However, the Contracting Officer is not obligated to delay award in order to enable an Offeror to submit a Seismic Certificate.

*Id.*

E.    Security Requirements

Notes from a GSA/IRS/Equis meeting held prior to the pre-proposal conference indicated that the security of the office was to be addressed as Level IV because the IRS did "not want to underestimate security as has previously happened in past projects."  AR 0351.  The SFO stated:

The selected lessor will be responsible for complying with the full security criteria with respect to all security systems and equipment and requirements as presented in the Level IV Department of Justice (DOJ) security standards.

AR 0186.  One of the requirements of Level IV security is that there be only one public entry point to the building, such that the Government can control and screen entrants to

the building. *Id.*

## II.   Submission of Initial Offers

On November 7, 2005, GSA received initial offers from 210 Earll, NGP Grace Court Phoenix II, LLC, and 4041 Central.  210 Earll stated in its cover letter that its offer was fully responsive to the solicitation as amended, and that the additional requirements were included in the rent offered, or alternatively could be performed by the Government by increasing the TI Allowance to $[      ] per square foot (rather than [      ] against the $36.00 allowance) with no change in the rental rate offered. AR 0401-03.

4041 Central's cover letter stated that the Government was "ultimately responsible to independently verify the suitability of the premises for occupancy by the proposed tenant."  AR 0872.  4041 Central's initial offer included a marked-up SFO, which checked "Substantial Compliance" (rather than full compliance) with the accessibility requirements, AR 0885; crossed out and indicated "No" to the Adjustment for Vacant Premises Clause, AR 0888; changed the minimum live load requirement from 80 to 70 pounds per square foot, AR 0893; deleted the requirement that public areas be painted at least every three years, AR 0897; and changed the termination notice requirement from 90 to 270 days.  AR 0918.

## III.   Review of Initial Offers

A meeting was held on November 10, 2005, to prepare for meetings with the prospective offerors.  At this meeting, Equis reported that "[t]here appears to be no issues with offers being under prospectus."  AR 1018.  The review of 4041 Central's initial offer indicated that the notes and changes on the SFO had to be removed; the painting of public areas had to be done every three years; the note on minimum floor load, changing it from 80 to 70 pounds per square foot, could be an SFO amendment; and 4041 Central needed to provide information on past performance. AR 1019.

On November 15, 2005, Equis sent requests for clarification to 210 Earll and 4041 Central, expressing concern for specific SFO elements.  AR 1026-31; 1032-36. The letter to 4041 Central required 4041 Central to remove its statement that it could not represent or warrant the accuracy of the submitted information.  The information provided in the offer was to be the basis for determining compliance with the award. AR 1026.  The letter also stated that 4041 Central could not remove the Adjustment for Vacant Premises Clause, that a 80 pound minimum floor load was required, and that the Government required cyclical painting of public areas.  AR 1027.  Equis also requested additional information concerning quality of space, past performance of offeror and other key personnel, past performance of offeror in managing and operating comparable facilities, and seismic certifications.  AR 1030-31.  On November 30, 2005, 4041 Central contacted Equis to determine whether failure to meet the 80 pound floor load requirement was a "super critical deal killer point."  AR 1112.

7

On November 28, 2005, Equis advised 210 Earll that the proposed layout of the Taxpayer Assistance Center would not meet the SFO requirement for contiguous space because it was in two blocks separated by a hallway.  AR 1088.

IV.   Responses to GSA's Offer Clarification Memos

210 Earll responded to GSA's clarification memorandum on December 3, 2005. AR 1126-1230.  4041 Central submitted its response to the clarification memorandum on December 6, 2005.  AR 1281-1461.  4041 Central's response included a "clean" copy of the SFO with all notations removed, AR 1282-1324, but included the same building description as its initial offer.  AR 1347-50.

4041 Central's response did not include a seismic certificate, but it informed Equis on December 13, 2005, that a seismic engineer would be conducting an analysis of the building's seismic compliance during the first week of January 2006.  AR 1475. On December 15, 2005, 4041 Central submitted a Certificate of Seismic Compliance that indicated that the certificate was based on ICSSC Table 1.1 and the building's classification as a "Benchmark Building."  AR 1487-89.  On December 23, 2005, GSA's engineer determined that this certificate was "unacceptable."  AR 1554.

On December 19, 2005, GSA sent to each of the offerors requests for revised final offers by the close of business on December 30, 2005.  AR 1499-1504.  This request stated:

> The Revised Final Offer should address any aspect of your proposal that you wish to modify.  Items that are not addressed will be construed as remaining unchanged from your initial offer.  If you do not submit a Revised Final Offer, the Government will consider your previous proposal to be your Revised Final Offer.  If any of the items addressed in the SFO have not been or are not addressed, your response shall be construed as noncompliant.

AR 1500, 1502, 1504.

V.   Revised Final Offers

210 Earll, 4041 Central, and Grace Court all submitted timely Revised Final Offers to the GSA.  210 Earll's offer included a rent computation sheet that broke down the offered rent into its various components, so that the net rent offered could be compared against the Prospectus Threshold of $2.47 million.  AR 1569.  210 Earll calculated the Prospectus comparison rent for years 1-10 (the fixed term of the lease) to be approximately $[          ], and the Prospectus comparison rent for years 11-20 to be just over $[          ].

The cover letter from 4041 Central's broker again stated that it did not represent or warrant the accuracy of the terms offered and that "the prospective tenant and its agents/representatives are ultimately responsible to independently verify the suitability of the premises for occupancy by the proposed tenant."  AR 1619.  4041 Central's revised offer stated that the live floor load was 80 pounds per square foot.  AR 1621.

VI.   <u>Prospectus</u>

The Public Buildings Act, 40 U.S.C. § 3301 *et seq.,* requires that leases over a certain threshold be submitted to Congress for approval.  This requirement forms the basis for the Government's Motion to Dismiss, which will be discussed in greater detail below.

On November 9, 2005, two days after the initial offers were received, the Contracting Officer wrote an email to GSA PBS Portfolio Management stating that the project should have been taken off the Prospectus list because it will be below Prospectus level.  AR 1002.  In a subsequent email, a representative of Equis stated that he had analyzed the three offers received; two of the three fell below the Prospectus Threshold, which he believed at the time was $2.6 million, and the other was only slightly over that amount.  AR 1000.

On November 22, 2005, Equis was made aware that the Prospectus Threshold was $2.41 million instead of $2.6 million.  AR 1060.  Equis advised that it did not think the lower Prospectus Level was going to be a problem, stating:

> The relocation offer at 4041 N Central has a net rent of $[      ] for years 1-10 and $[         ] for years 11-15.  The BTS location has a net rent of $[         ] for years 1-10 and $[         ] for years 11-15.  The existing location is the only one that may have a problem since their net rent is $[      ] for years 1-15.  But, it must be noted that the existing location will need to lower its rent significantly in order to compete against the relocation option.

AR 1059.

On December 19, 2005, 210 Earll requested that GSA confirm that the Prospectus Threshold was $2.47 million.  AR 1506.  This request was re-iterated on December 20 and December 22.  AR 1518, 1548.  On December 22, 2005, Equis confirmed that the applicable threshold was $2.47 million and stated that the GSA's expectation was that "this acquisition will result in a lease that falls below this prospectus threshold."  AR 1551.

In a January 12, 2006 Price Negotiation Memorandum, Equis summarized its communications with 210 Earll about the Prospectus Threshold.  AR 1970-71.  Equis informed 210 Earll on December 19, 2005, that no Prospectus Approval had been

obtained, and that offers above the Prospectus would not be automatically eliminated, but whether a Prospectus Approval would be sought in such a circumstance would be contingent on all other offers received.  AR 1970.  Equis advised 210 Earll on multiple occasions to try to reduce its costs as much as possible.  AR 1970-71.

VII.   <u>Review of Revised Final Offers and Award</u>

Equis prepared price evaluations on the revised final offers.  Equis determined that Total Per Usable Square Foot Present Value Per Year for 4041 Central was $[          ], for 210 Earll was $[          ], and for Grace Court was $[          ].  AR 1894, 1906, 1917.  Equis' calculation of 4041 Central's offer did not contain an adjustment for moving or relocation costs.  Its calculation of 210 Earll's offer was not adjusted to factor in the six tenant improvement items that only 210 Earll was asked to provide at its own cost as part of its offer.

Equis determined that the annual rental price for 4041 Central was $[          ], for 210 Earll was $[          ], and for Grace Court was $[          ].  AR 1895, 1907, 1918.  Of the three offers, Equis concluded that only 210 Earll's annual rental price was over the Prospectus Threshold.  AR 1883, 1896, 1908.  In an internal email dated January 3, 2006, Equis noted that although Grace Court's offer was higher than $[          ], it came in approximately $[          ] under the Prospectus Threshold due to Grace Court's excessively high operating costs.  AR 1908.  Equis' evaluation of 210 Earll's offer does not include the adjusted operating costs noted in 210 Earll's offer for years 11-20.  AR 1907.  210 Earll contends this led Equis to incorrectly calculate its average annual rental price and place it over the Prospectus Threshold.

On January 6, 2006, Equis contacted 4041 Central to advise them that the Seismic Certificate it had submitted was not acceptable, and informed 4041 Central that if it was awarded the lease, "the Seismic compliance would be made a condition of award."  4041 Central assured Equis that the building would comply with the seismic requirements.  AR 1965.

The abstract of offers prepared by Equis did not include an evaluation of the award factors identified in the SFO, nor a technical ranking of the offerors on the basis of the award factors.  AR 1966.  Equis and the Contracting Officer prepared a price negotiation memorandum that concluded that 4041 Central's proposed rental rate per rentable square foot including tenant improvements was fair and reasonable, and was below the market range of $24-$27 per square foot.  AR 1979.

210 Earll contends that the omission of any evaluation of non-price factors converted the solicitation from "price plus other factors" to a "price only" solicitation, in violation of the SFO.  As we shall see, the Government responds that any defect was harmless and was, in any event, corrected during the litigation before the GAO.

On January 27, 2006, Equis advised 4041 Central that its offer had been selected for award under the SFO.  AR 1993.  The Summary of Award, dated January 30, 2006, stated that 4041 Central's offer was selected as the "most advantageous to the Government based on price, with other factors considered." AR 2249.  On January 30, 2006, the Contracting Officer sent a letter to 4041 Central accepting the offer and stating that the GSA would not "recognize any changes to the Lease Agreement unless authorized in writing by the Contracting Officer."  AR 2000. The lease documents were delivered to 4041 Central on January 30 and signed by it on January 31, 2006.  AR 2001-2246.  The lease stated that 4041 Central was required to submit a revised certificate of seismic compliance "no later than 60 calendar days from the date of lease award."  AR 2004.  On February 23, 2006, GSA's engineer determined that 4041 Central's seismic certificate was acceptable.  AR 2267.

210 Earll requested a statutory debriefing from the GSA on January 27, 2006, and the debriefing was held on February 1, 2006.  AR 1992, 2247-48.  When asked how price was considered relative to the other award factors, the GSA responded that "all offers were basically equal on the Other Factors and Price was the primary determination in the evaluation and selection."  AR 2247.  The GSA informed 210 Earll that "this truly was an economic decision and that their building really had no minus's [sic], but the overriding factor was price."  *Id.*

VIII.   <u>GAO Protest</u>

210 Earll filed a timely bid protest with the GAO on February 6, 2006. AR 2251-56.  On February 24, 2006, GSA requested that GAO summarily dismiss the protest, alleging that 210 Earll was not an interested party because its offered rent exceeded the Prospectus Threshold and the Public Benefits Act consequently barred the GSA from awarding the lease to 210 Earll.  AR at 2290-99.  On March 3, 2006, GAO denied GSA's request for summary dismissal, and ruled that 210 Earll was an interested party.  AR 2688.

The GSA filed its agency report with the GAO on March 14, 2006.  AR 2331-68. Appended to this report was an undated "Statement of Relevant Facts" by the Contracting Officer that explained how the Contracting Officer had evaluated the offers. AR 2341-49.  This document said that the Contracting Officer evaluated the offers in accordance with the SFO, particularly as to the "Other Factors," and that the Contracting Officer determined that 210 Earll's and 4041 Central's buildings were essentially equal on the "Other Factors."  The agency "acknowledge[d] that the documentation supporting the award decision is not at the level one customarily expects in a procurement of this size."  AR 2564.  However, the Government contends that the Contracting Officer's statement supplies the legal requirements for documenting the award decision.

In an April 12, 2006 memorandum, GAO counsel indicated that the protest was a good candidate for outcome prediction ADR procedures due to the "agency's lack of contemporaneous evaluation documentation." AR 2689. On April 24, 2006, during an ADR conference call, GAO counsel requested written submissions on the limited issue whether the GSA award letter constituted a binding contract under the SFO. The GSA argued that a valid lease existed between GSA and 4041 Central and that it believed 210 Earll was not an interested party. AR 2682-84. The GSA indicated that it was "prepared, based in part on the April 24, 2006 ADR outcome prediction conference, to recompense [210 Earll] for its proposal preparation costs incurred in connection with this procurement as well as its costs, including attorneys' fees, incurred in connection with this protest." AR 2683-84. The GSA then requested that the GAO dismiss the protest as academic since GSA's payment "would provide [210 Earll] with the relief otherwise available to it should GAO ultimately sustain this protest." AR 2684.

On May 5, 2006, the GAO issued its decision determining that the protest was "academic." AR 2686. In a footnote, the GAO stated that it appeared a valid lease existed between the GSA and 4041 Central and that "[u]nder these circumstances, [the GAO is] not prepared to make a recommendation which arguably might generate a breach of contract claim." AR 2687.

The Government and 4041 Central again raised the question of whether an enforceable contract existed between 4041 Central and GSA in this litigation. They argue that the existence of an enforceable contract affects what relief should be provided by the Court because it is not in the public interest to require the Government to breach a contract. However, whether there is an enforceable contract between these parties does not change this Court's jurisdiction to give appropriate relief, including vacating the award, if we conclude that the Government committed reversible error in the procurement process. The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104-320, §§ 12(a), (b), 110 Stat. 3870, authorizes this Court to afford relief in a bid protest by "award[ing] any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

## DISCUSSION

I.    Standing

To have standing to bring a bid protest claim, the plaintiff must establish that it is an "interested party," 28 U.S.C. § 1491(b)(1), and that it was prejudiced by the error in the procurement process. *See Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996). The Government filed a Motion to Dismiss for lack of jurisdiction, asserting that 210 Earll is not an interested party. The Government claims that because 210 Earll's best and final offer rent price was determined to be above the Prospectus Threshold, 210 Earll was ineligible for award of the lease. According to the

Government, awarding the lease to 210 Earll when no Prospectus had yet been obtained would result in a violation of the Public Buildings Act, 40 U.S.C. § 3301 *et seq.*, and the Anti-Deficiency Act, 31 U.S.C. § 1341.

    A.    <u>210 Earll is an Interested Party</u>

"A two-part test is applied to determine whether a protester is an 'interested party:' the protester must show that it was an *actual or prospective bidder*; and the protester must have a *direct economic interest* in the procurement." *Comprehensive Health Services, Inc. v. United States*, 70 Fed. Cl. 700, 715 (2006) (emphasis in original). 210 Earll clearly satisfies the first requirement. However, the Government asserts that 210 Earll did not have a direct economic interest in the procurement because it was ineligible to receive award of the contract. The Government claims that the Public Buildings Act prohibited the GSA from awarding the lease to 210 Earll because its best and final price offer was above the Prospectus Threshold and the GSA had not obtained a Prospectus for this lease.

The Public Buildings Act provides, in part, that:

(a) The following appropriations may be made only if the Committee on Environment and Public Works of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives adopt resolutions approving the purpose for which the appropriation is made: . . .

    (2) An appropriation to lease any space at an average annual rental in excess of [the current prospectus threshold value] for use for public purposes.

40 U.S.C. § 3307(a)(2).  While the Public Buildings Act would require the GSA to obtain Prospectus approval before executing a lease that exceeded the threshold, the Act does not operate as a bar to award of such a lease.  Nor does the Anti-Deficiency Act prohibit the GSA from awarding a lease above the Prospectus Threshold.  The Anti-Deficiency Act prohibits a Government officer or employee from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation[.]"  31 U.S.C. § 1341(a)(1)(A). Together, the Public Buildings Act and Anti-Deficiency Act require only that GSA take the extra step in the procurement process of obtaining Prospectus approval before executing an awarded lease above the Prospectus Threshold.

We note as well that there is considerable uncertainty in the calculation of the threshold, both as to what values go into its determination, and whether the threshold is based on the year of the award or the year the lease begins. And, finally, there are disputes as to the proper calculation of 210 Earll's price for purposes of determining whether it is within threshold.

According to the "Abstract of Offers," there were no deficiencies in 210 Earll's offer and it was the second lowest offeror.  Because 210 Earll was eligible for award and was the second in line for the award, it is an "interested party."  *See Comprehensive Health Services*, 70 Fed. Cl. at 717 ("As the first runner-up, [the plaintiff] has a 'direct economic interest' in the award of the [contract] and, therefore, is an 'interested party.'")

B.    Prejudice

"[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits."  *Info. Tech. & Applications Corp. v. United States* ("ITAC"), 316 F.3d 1312, 1319 (Fed. Cir. 2003). At this stage of the analysis, the Court assumes as true the alleged errors in the procurement process. To establish prejudice, the plaintiff must demonstrate that it had a substantial chance of receiving the award, but for the alleged error.  *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1331 (Fed. Cir. 2004); *see also ITAC*, 316 F.3d at 1319.  "[T]he protestor's chance of securing the award must not have been insubstantial." *ITAC*, 316 F.3d at 1319 (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 1113 (2002); *Impresa Construzioni  Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001)).

In *ITAC*, the U.S. Court of Appeals for the Federal Circuit found that the plaintiff's "proposal would have been improved and its chances of securing the contract increased" if the alleged errors in the procurement process were cured.  *ITAC*, 316 F.3d at 1319.  The agency had determined that all proposals "met the minimum contract requirements" and "were fundamentally sound."  The Federal Circuit concluded that the plaintiff was an interested party that "had greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest."  *Id.*

210 Earll alleges that GSA's errors in its cost analysis and failure to consider the other non-price factors in evaluating the offerors' proposals disadvantaged it in the procurement process. Similarly to the plaintiff in *ITAC*, there is no question that correcting these alleged errors would improve 210 Earll's proposal and increase its chances of securing the award.  The GSA found no deficiencies in 210 Earll's offer and had determined that 210 Earll was the second-lowest priced offer.  210 Earll has demonstrated that "it had greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest."  *See ITAC*, 316 F.3d at 1319.  210 Earll has successfully established standing and Defendant's Motion to Dismiss is denied.

II.    Administrative Record Review

This case comes before us on cross-motions for judgment on the administrative record pursuant to the former Rule 56.1 of the Rules of the United States Court of Federal Claims ("RCFC").  During the briefing of this motion, the U.S. Court of Federal

Claims adopted amendments to several provisions of the RCFC, replacing the former RCFC 56.1 with the new RCFC 52.1, entitled "Motions Respecting the Administrative Record.  *See* Notice of Adoption of Amendments to Rules of the United States Court of Federal Claims, 2006 U.S. Order 31 (June 20, 2006).

The standard of review for a motion for judgment on the administrative record under RCFC 52.1 remains unchanged from the standard under the now-repealed RCFC 56.1.  *See Groff v. United States*, 72 Fed. Cl. 68, 70 n.2 (2006).  In deciding motions for judgment on the administrative record, the Court takes an existing administrative record and is allowed to resolve questions of fact "by weighing the evidence present in the administrative record, as properly supplemented."  *Six v. United States*, 71 Fed. Cl. 671, 679 (Fed. Cl. June 30, 2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005)).

This Court's jurisdiction over bid protest cases is prescribed by the Tucker Act, 28 U.S.C. § 1491 (b) (1) (2000), as amended by the Administrative Disputes Resolution Act of 1996, Pub. L. No. 104-320, § 12(a), 10 Stat. 3870, 3874-75.  Pursuant to that authority, we review procurement decisions of an agency under the standard of review set forth in the Administrative Procedures Act, 5 U.S.C. § 706(2)(A).  *See* 28 U.S.C. § 1491 (b) (4) (2000). The arbitrary and capricious standard is taken from the Administrative Procedures Act (APA), 5 U.S.C. §§ 701-706 (1994).  In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), the Supreme Court stated:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.  Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency.

*Id.* at 416 (citations omitted).  Therefore, the Court's review of a procuring agency's decision to award a contract to one bidder over another is extremely deferential.  *Cygnus Corp., Inc. v. United States*, 72 Fed.Cl. 380, 384 (2006).  The agency is required only to provide "a coherent and reasonable explanation of its exercise of discretion and the disappointed bidder bears a 'heavy burden' of showing that the award decision had 'no rational basis.'"  *Impresa Contruzioni*, 238 F.3d at 1333 (internal citations omitted).

The APA requires the agency to consider all relevant factors and articulate "a rational connection between the facts found and the choice made."  *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 358 (2004).  The plaintiff in a bid protest must establish that the procuring agency's error "was so excessive as to fall outside the

15

decision-maker's ambit of discretion," *Cygnus Corp.*, 72 Fed. Cl. at 384, and persuade the Court "that there was no rational basis for the agency's determination." *Baird Corp. v. United States*, 1 Cl. Ct. 662, 664 (1983).

A.   GSA Failed to Consider Non-Price Factors

Under the terms of the SFO, the GSA was required to analyze both price and non-price factors in making its award determination.  AR 0078-79.  In addition to considering the cost of the lease, the GSA was to analyze the accessibility, seismic compliance, and quality of space of the properties offered, as well as the past performance of the Offeror on comparable projects and in managing and operating comparable facilities. *Id.*

Equis prepared an "Abstract of Offers" for GSA.  The abstract stated whether each of the three offerors submitted the required certifications and documents, listed the area measurements of each offered property, and provided a financial summary of the offers.  AR 1966.  The abstract did not include any evaluation of the award factors identified in the SFO, nor did it provide a technical ranking of the offerors on the basis of the award factors.  It converted the award decision to a price-only evaluation among technically qualified offerors.

Equis and the Contracting Officer prepared a Price Negotiation Memorandum that summarized the negotiations with the offerors.  Under the "Negotiation Objectives" section, it was stated that the net rental rate could not exceed the Prospectus Threshold for 2006, because a Prospectus Approval had not been sought.  AR 1967.  However, this requirement was not included in the SFO, nor is it required by law.  There is nothing in the statute that precludes GSA from seeking Congressional sanction after award but before the execution of the lease.

The Administrative Record does not contain any contemporaneous evaluation or analysis of the non-price award factors after the best and final offers were received.  At the GAO protest, the GSA acknowledged that "the documentation supporting the award decision is not at the level one customarily expects in a procurement of this size." AR 2564.  The Government also admitted here that "210 Earll would be correct to state that there was a gap in the record, in so far as the record filed at the GAO protest contained no single document memorializing the contracting officer's final assessment." Def. Br. at 28.  We may thus conclude that GSA did not provide a coherent and reasonable explanation for its exercise of discretion – it gave none at all.  In this respect, its decision was "arbitrary and capricious."  *Impresa Construzioni,* 238 F.3d at 1332-33 ("[T]he test for reviewing courts is to determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion [.]'") (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir.1994)).

The Government attempted to fill in this gap in the record with what it claims is a "declaration" by the Contracting Officer. This "declaration" is an undated nine-page document – "Statement of Relevant Facts In Response to Protest of 210 Earll, L.L.C." – created by the Contracting Officer, Joseph D. McPherson, during the course of the GAO Protest. AR 2341-49. In this document, Mr. McPherson stated that Equis reviewed the Best and Final Offers and recommended that 4041 Central receive the award. Mr. McPherson agreed with Equis and concluded that none of the offerors "had an advantage in the evaluation using all the Award Factors exceeding the benefits to the Government of 4041 Central on Price." AR 2341.

The document contained a section entitled "Detailed Explanation of Issues Raised in the Protest," which evaluates the non-price factors that 210 Earll claimed the GSA failed to adequately consider. AR 2342-49. It is this portion of the document that the Government claims remedies the lack of documentation of a contemporaneous evaluation of the "Other Factors." However, nothing in this document indicates that the analysis it describes was made before the award; in fact, the title of the document states that it was made "In Response to" the GAO protest. The document was created after the award decision, as a piece of advocacy for the GAO protest supporting the agency's award decision. Given these circumstances, the "analysis" contained in the document could hardly be described as objective.

Furthermore, even if the analysis contained in the "Statement of Relevant Facts" was sufficient to fill the gap in the decision documentation, this document does not satisfy the requirements of an unsworn declaration. An unsworn declaration executed in the United States may be admissible and given the same effect as a sworn declaration if it is dated and states that it was made under penalty of perjury. 28 U.S.C. § 1746. A document that does not meet these requirements should not be considered by the court. *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363 n.3 (6th Cir. 2001); *DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 471 (7th Cir. 1990) (Affidavit that did not state it was made under penalty of perjury "was not within the range of evidence that the district court could consider.").

The Contracting Officer's "Statement of Relevant Facts" is not dated and does not state that it was made under penalty of perjury. It does not satisfy the requirements of an unsworn declaration under 28 U.S.C. § 1746, and may not be relied upon by this Court. The Government has not pointed to any other evidence in the Administrative Record that would support a finding that the GSA conducted an analysis of the non-price factors in making its award decision, as required under the terms of the SFO.

The Government argues that the Contracting Officer's statement reduces the "document gap" to harmless error because it supplies the missing rationale. It argues, in effect, that we are engaging in an unnecessary formalism in making the Contracting Officer do again on remand what he has already done, albeit a little late. As a practical matter, counsel candidly predicts the results cannot be expected to be different.

We are not impressed by this appeal to expediency.  The APA requires a reasoned analysis at the time of the decision.  It does not require a reasoned analysis only when the Contracting Officer's decision is challenged in court.  *Cf. Reilly's Wholesale Produce v. United States*, 2006 WL 3094096, *9 (Fed. Cl. 2006) (declining to accept Government's *post hoc* justification for override of a statutory stay that contradicted administrative record); *Advanced Sys. Dev. Corp., Inc. v. United States*, 72 Fed. Cl. 25, 33-35 (2006) (rejecting Government's attempt to supplement the record to correct a deficient justification for the override of a statutory stay); *Blackhawk, Inc. v. United States*, 05-552, Temporary Restraining Order of May 18, 2006 (finding Government failed to comply with documentation requirements for overriding a statutory stay).  To accept the Contracting Officer's *post hoc* explanation as sufficient to cure his earlier error would set a most disruptive precedent.

The GSA's failure to consider the non-price factors in making its award decision constitutes reversible error.  We vacate the award and remand this case to the GSA for an award determination that includes a documented analysis of the non-price factors.

4041 Central argues that 210 Earll has not demonstrated prejudice because 210 Earll has not shown that a proper analysis of the non-price factors would bridge the $[     ] difference between 4041 Central's and 210 Earll's offers.  It would be improper for this Court to reach such a conclusion; to do so would require the Court to substitute its own analysis of the non-price factors for that of the agency.  It is sufficient that 210 Earll was prejudiced by the loss of the opportunity to compete for the lease on the basis set in the SFO.

\* \* \*

The parties have raised a number of additional alleged errors.  We address them in turn for GSA's consideration on remand.

B.     GSA Failed to Factor Relocation Costs into 4041 Central's Offer

210 Earll argues that one of the flaws in GSA's cost analysis was that it failed to factor relocation costs into 4041 Central's offer.  The GSA confirmed this error in the GAO protest and conceded this point as an "oversight."  The GSA provided a recomputed price analysis in the GAO protest, using a range of estimates.  210 Earll claims that GSA erred by using these estimates rather than attempting to determine the actual relocation costs of moving the IRS facility from 210 Earll to 4041 Central.

On remand, GSA must recalculate 4041 Central's offered price to include relocation costs.  However, because the SFO is silent on how these relocation costs are to be calculated, we cannot conclude in advance that the Contracting Officer's proper use of reasonably calculated estimates, rather than determining actual relocation costs, in recomputing 4041 Central's price offer would be arbitrary and capricious.

### C. GSA Properly Determined 4041 Central Was Eligible

210 Earll alleges that 4041 Central was a non-conforming bidder because it offered a building that failed to meet the minimum standards of the solicitation. Specifically, 210 Earll claims that 4041 Central's building does not meet the contiguous space requirements, secured parking requirements, Level IV Security Standards, and the Seismic Standards. 210 Earll also cited additional deficiencies of the 4041 Central building that it claims GSA should have verified could be remedied before making the award.

### 1. Contiguous Space

The SFO permitted the Taxpayer Assistance Center to be located on the ground floor and the remaining space could be separated by being on the third floor or above. 4041 Central offered space in two separate buildings, with the Taxpayer Assistance Center being located on the ground floor of a different building than the one housing the rest of the IRS space. 210 Earll claims that 4041 Central's space does not meet the contiguous space requirements because the space offered is contained in two separate buildings.

The contiguous space requirement explicitly allows the Taxpayer Assistance Center to be located apart from the rest of the "space." GSA interpreted this requirement as permitting the Taxpayer Assistance Center to be located in a separate building from the rest of the offered space, so long as it met the requirement that it be located on the ground floor of a "quality building." GSA's interpretation of the "contiguous space" requirement as allowing the Taxpayer Assistance Center to be located on the first floor in a building separate from the rest of the IRS space is not arbitrary and capricious. The fact that 4041 Central's Taxpayer Assistance Center was located in an annex within its building facility did not violate the SFO.

### 2. Secured Parking Requirements and Level IV Security Standards

The SFO required the lessor to provide secured parking spaces in a totally enclosed area with electronic access control. 4041 Central's offered parking facility currently serves both non-government tenants and the general public. 210 Earll claims that under the SFO, GSA was required to either determine that the parking facility offered by 4041 Central complied with the SFO requirements or include the cost of such compliance into the award evaluation.

4041 Central claims that it can meet the secure parking requirements prior to delivery of the space to the IRS and that the GSA contemplated that most of the security requirements or necessary upgrades were to be covered by the TI allowance. The Government argues that 4041 Central's offer did not take any exception to the secured parking requirement and therefore must be read as including a commitment on the part of 4041 Central to meet this requirement.

19

210 Earll also alleges that given the current state of 4041 Central's building, the possibility of 4041 Central meeting the Level IV security requirements are at least very expensive, if possible at all.  4041 Central's offered space contains eight access points, houses multiple tenants, no fencing or set-backs, and presently has no Level IV security infrastructure in place.  4041 Central's proposed IRS space consists of three non-contiguous blocks, including a Taxpayer Assistance Center housed in an annex separate from the building housing the rest of the IRS space.  The architect of record for 4041 Central stated that the building is not a good candidate to meet the Level IV security requirements.

A Government security specialist found that 4041 Central's property was suitable for meeting Level IV security requirements.  The Government again notes that 4041 Central took no exception to these requirements.  Security is the responsibility of the lessor, and 4041 Central's offer must be read as a commitment to meet the Level IV security requirements.  210 Earll's assertions that 4041 Central will not be able to come into compliance are challenges to the performance of this contract, which is not an appropriate argument in a bid protest.

The Government's conclusion that 4041 Central's offer should be read as a commitment to comply with the secured parking requirement and Level VI security standards is not arbitrary and capricious.  This conclusion is supported by the fact that the GSA contemplated that the necessary upgrades would be covered by the TI Allowance.  210 Earll has not shown that 4041 Central cannot comply with this requirement prior to delivery of the space or that it was irrational for the GSA to conclude that 4041 Central could comply by that time.

### 3.   Seismic Standards

The SFO stated that offers that did not meet the Seismic Standards would not be considered if at least one offer met the standards and other requirements of the solicitation.  However, under the SFO, the Contracting Officer had discretion to allow an offeror to submit a Seismic Certificate after the deadline.

4041 Central did not submit a Seismic Certificate until December 15, 2005 and GSA determined on December 23, 2005, that this certificate was "unacceptable."  The Contracting Officer decided to allow 4041 Central to submit an acceptable Seismic Certificate after the deadline, and GSA indicated to 4041 Central that the awarded lease was made "conditional" on GSA receiving the documents necessary to support the seismic certificate.  GSA did not determine that 4041 Central had an acceptable Seismic Certificate until February 23, 2006.

210 Earll alleges that because it met the seismic standard and all other requirements of the solicitation, and 4041 Central did not submit an acceptable certificate until after the award, then under the SFO, 4041 Central should not have been considered for the award.  The Government claims that 210 Earll's argument is without

merit because 4041 Central does meet all required seismic standards and the Contracting Officer had a right under the express terms of the SFO to agree to provide additional time to 4041 Central to obtain the certificate.  Furthermore, the Government argues that 210 Earll was not prejudiced by the CO electing to allow the submission of the certificate after the conditional award, because 4041 Central did meet the seismic requirements.

The SFO states that "offers which do not meet the Seismic Standards will not be considered."  It does not say that offers that do not submit an acceptable Seismic Certificate will not be considered – in fact, the SFO specifically allows the Contracting Officer to accept Seismic Certificates after the deadline for best and final offers. AR 0079.  The Government did not act in an arbitrary and capricious manner when it decided to allow 4041 Central to submit an acceptable certificate after award. Moreover, 210 Earll was not prejudiced by this decision; 4041 Central does fully comply with the seismic requirements.

### 4.   Other Allegedly Non-Conforming Items

4041 Central's initial offer contained a marked-up SFO that made some changes to the terms of the SFO, including changing the minimum live load requirement from 80 to 70 pounds per square foot.  4041 Central's best and final offer included a clean, unmarked SFO, and 4041 Central initialed every page of and duly executed the Lease. 210 Earll alleges that the GSA should have verified that 4041 Central could meet the 80 pound requirement and should have proceeded with due diligence to verify that 4041 Central's building met the minimum requirements of the SFO before making the award.

GSA determined that 4041 Central's building would comply with the SFO requirements because it did not take any exceptions to these requirements in its best and final offer.  4041 Central submitted a clean copy of the SFO and agreed to every term of the Lease Agreement.  It was bound to meet these requirements by the time the Lease went into effect.  The Government anticipated that the successful offeror's building would need work in order to come into full compliance with the terms of the SFO and the Lease, and the Tenant Improvement Allowance was expected to cover many of the renovations necessary to comply with these requirements.  Any failure on 4041 Central's part to come into compliance with the terms of the SFO and the Lease would constitute a breach of the contract between 4041 Central and the Government, but it is not an appropriate basis for challenging a lease award.

Any current flaws in 4041 Central's building or doubts as to whether 4041 Central could comply with the terms of the Lease and the SFO at the time the Lease went into effect are things that GSA may take into account in its analysis of the "other factors."  The GSA was not required to independently verify that every requirement was met before award or determine whether they could be met before the Lease went into effect.

D.     Cost Analysis

210 Earll claims that the GSA made several errors in its cost analysis that resulted in an inaccurate comparison between 4041 Central's and 210 Earll's price offers.  210 Earll alleges that GSA improperly inflated its proposed net rent, which led GSA to erroneously conclude that 210 Earll's offer was above the Prospectus Threshold; that GSA failed to consider the lump sum costs to be borne by the Government in its price evaluation; and that GSA failed to adjust 210 Earll's and 4041 Central's offers to account for the additional six items that only 210 Earll was required to provide as part of its offer.

1.     Prospectus Threshold

In determining the proposed net rent for the purposes of comparison to the Prospectus Threshold, the Government considers the "average annual rental" during the "firm term" of the lease.  *See* 40 U.S.C. § 3307(a)(2); AR 2313-2319, October 26, 1972 Letter from Comptroller General  to the Acting Administrator of General Services. 210 Earll alleges that GSA erred because it calculated the net rent over twenty years, when the SFO stated that the firm term of the lease was ten years.  210 Earll also claims that GSA improperly calculated the "average annual rental" for the twenty-year period because it failed to discount the operating costs for years 11-20.

The SFO states: "The lease term is for 20 Years, 10 Years Firm Term.  GSA may terminate this lease anytime after the ten year firm term on 90 days written notice to the Lessor."  AR 0071 (emphasis in original).  GSA calculated the average net rent of the offerors over the entire lease term, including years 11-20.  The Government did not address during briefing 210 Earll's contention that the firm term of the lease was ten years.  However, at oral argument, the Government raised for the first time the argument that the firm term of the lease was twenty years, because the lease would only terminate after ten years if the Government took specific action.  Raising a new argument at oral argument violates this Court's Special Procedures Order.  *See* Special Procedures Order of December 20, 2005, ¶ 10 ("Oral presentations will be limited to arguments and authorities contained in the written submissions.  New matters advanced during argument may be ruled out of order.*").

Even if the Court were to allow the Government's argument that the firm term of the lease should be twenty years, this interpretation clearly contradicts the plain language of the SFO.  It is twice stated in the lease term provision that the firm term of the lease is ten years.  Consequently, we agree with 210 Earll that GSA should have calculated the proposed net rent using an average of only the first ten years of the lease.

210 Earll cites to the Comptroller General's definition of the "average annual rental" as the "amount of consideration for the use of the land and buildings or portions of buildings, during the firm term of the lease, excluding the costs of services."  Pl. Rep.

at 13.  Under this definition, 210 Earll claims, the GSA should have excluded the operating costs for years 11-20 of the lease term. Because 210 Earll alleges only that the GSA miscalculated the "average annual rental" by including the cost of services for years beyond the firm term of the lease, we do not need to address whether GSA erred in its calculations in this respect.

If GSA intends to make a comparison with the Prospectus Threshold on remand, it must recalculate the proposed net rent for each of the offers over only the first ten years of the lease

### 2.   Lump Sum Costs and 210 Earll's Six Additional Items

210 Earll alleges that GSA erred in failing to take into consideration the lump sum costs to be borne by the Government.  The GSA stated that it did not include lump sum costs in its cost analysis, because it did not have a basis for assuming that tenant improvements and security costs would cost more at one building than another. 210 Earll counters that it is *per se* irrational to conclude that the tenant improvement and security costs would be identical for two different buildings, especially considering the IRS is already located at 210 Earll.

The SFO did not state how the GSA was to conduct its analysis of the price factors.  It was within the GSA's discretion to make reasonable assumptions about the difference in the lump sum costs to be borne by the Government between the various offers.  Although 210 Earll is almost certainly correct in its assertion that the costs at the two facilities would not be identical, it has not shown that the price differential is so great that the GSA acted in an arbitrary and capricious manner in concluding that the tenant improvement and security costs above the Tenant Improvement Allowance would be the same or nearly the same and therefore would not have an impact on the cost analysis.

210 Earll also claims that GSA erred when it did not factor into its cost analysis 210 Earll's expenses in providing the six additional items beyond the SFO requirements.  210 Earll argues that this created an advantage for 4041 Central, because the cost of these improvements to the other offerors would be paid out of the Tenant Improvement Allowance, whereas 210 Earll had to include these costs as a base expense in its offered rental price while still providing the same Tenant Improvement Allowance to the Government.

GSA requested that 210 Earll paint the exterior of its building; provide new paint and carpet throughout the space, including those areas that are not covered by the new lease; update the current HVAC system to meet current Government requirements; and correct problems with the faucets and ventilation in the restrooms.  GSA also required that certain improvements be done outside of the normal working hours, because the IRS currently occupies the space at 210 Earll.

Equis informed 210 Earll's broker before best and final offers were submitted that it was not the intent of the GSA to permit the use of existing carpet at any location, and that both painting and carpeting are tenant improvements.  AR 0382.  210 Earll is incorrect in its assertion that it was required to include the painting and carpeting costs as a base expense in its rental price; Equis explicitly informed 210 Earll that it could [       ] to be used against its Tenant Improvement Allowance to cover these costs.  *Id.* The remaining requirements – updating the HVAC system, making repairs to the restrooms, and completing the improvements outside of normal working hours – are specific to 210 Earll's property.  210 Earll has not provided any evidence that similar requirements would be made of the other offerors.  The GSA did not act in an arbitrary and capricious manner when it did not consider these expenses in its cost comparison. We note as well that the other offerors were properly charged with relocation costs, whereas 210 Earll, the incumbent, of course, was not.

## CONCLUSION

210 Earll is an interested party with standing to challenge GSA's award of the lease to 4041 Central, and 4041 Central was a conforming bidder eligible for award. We hold that GSA's decision to award the lease to 4041 Central without any documented analysis of the non-price factors was arbitrary and capricious.  GSA also erred when it failed to factor relocation costs into 4041 Central's offer as required by the SFO, and when it miscalculated the average annual rent for purposes of comparison with the Prospectus Threshold.  We conclude, however, that the Contracting Officer did not act in an arbitrary and capricious manner when he elected not to factor the lump sum costs or six additional requirements imposed on 210 Earll in his cost analysis.

**For the foregoing reasons, we DENY the Government's Motion to Dismiss, GRANT Plaintiff's Motion for Judgment on the Administrative Record in Part, and GRANT Defendant's and Intervenor's Cross-Motion for Judgment on the Administrative Record in Part.  We vacate the award to 4041 Central and remand to the GSA for a correction of the errors and a decision consistent with this ruling**.

**IT IS SO ORDERED.**

 /s/ Lawrence M. Baskir  
LAWRENCE M. BASKIR  
Judge